Cardillo & Corbett
Attorneys for Plaintiff
Swiber Offshore Construction Pte.Ltd.
29 Broadway
New York, New York 10006
Tel: (212) 344-0464
Fax: (212) 797-1212
Francis H. McNamara (FM4649)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
SWIBER OFFSHORE CONSTRUCTION :
PTE. LTD., :
 : **ECF**
     Plaintiff, :
 : **<u>VERIFIED COMPLAINT</u>**
   -against- :
 :
LIKPIN INTERNATIONAL LTD., :
 :
     Defendant. :
------------------------------------x

   Plaintiff, Swiber Offshore Construction Pte. Ltd.
(hereinafter referred to as the "Plaintiff"), by and through its
attorneys, Cardillo & Corbett, as and for its Verified Complaint
against Likpin International Ltd. (hereinafter referred to as
the "Defendant"), alleges, upon information and belief, as
follows:

JURISDICTION

   1. This is an admiralty and maritime claim within
the meaning of Rule 9(h) of the Federal Rules of Civil Procedure
and 28 United States Code § 1333.

THE PARTIES

2.    At all times material to this action, Plaintiff was, and still is, a corporation created and existing under the Republic of Singapore, with an address at 12 International Business Park, Cyberhub@IBP #04-01, Singapore 609920.

3.    Upon information and belief, the Defendant was, and still is, a foreign corporation, or other business entity, organized under foreign law, with a place of business at Representative Office 13-02, 13 Floor City Tower 1, Sheikh Zayed Road, Dubai, United Arab Emirates.

FIRST CAUSE OF ACTION

DEFENDANT'S BREACH OF THE CONTRACT DATED
MAY 29, 2009 - M/T SWIBER CONCORD

4.    On May 29, 2009 the Plaintiff, as owner, time chartered the tug boat SWIBER CONCORD to the Defendant, as charterer, (the "SWIBER CONCORD Charter") on the terms stated in the copy of the SWIBER CONCORD Charter annexed hereto as Exhibit 1.

5.    The SWIBER CONCORD was delivered into the Defendant's service and has fully performed under the terms of the SWIBER CONCORD Charter.

6.    The Defendant, however, has failed to pay to the Plaintiff the sum of $6,132,784.47 in charterer hire and other payments due to the Plaintiff from the Defendant under the terms

2

of the SWIBER CONCORD Charter.

       7.    By reason of the aforesaid, the Plaintiff has suffered damages in the amount of $6,132,784.47, and the Plaintiff is entitled to interest, attorneys' fees and costs as set forth hereinafter.

       8.    The Plaintiff has started arbitration in Singapore against the Defendant as provided in the SWIBER CONCORD Charter.  Arbitrators in Singapore customarily award interest, legal fees and arbitration costs to the prevailing party.

### SECOND CAUSE OF ACTION

DEFENDANT'S BREACH OF THE CONTRACT DATED
JULY 7, 2009 - M/T SWIBER GLORIOUS

       9.    On July 7, 2009 the Plaintiff, as owner, time chartered the tug boat SWIBER GLORIOUS to the Defendant, as charterer, (the "SWIBER GLORIOUS Charter") on the terms stated in the copy of the SWIBER GLORIOUS Charter annexed hereto as Exhibit 2.

       10.    The SWIBER GLORIOUS was delivered into the Defendant's service and has fully performed under the terms of the SWIBER GLORIOUS Charter.

       11.    The Defendant, however, has failed to pay to the Plaintiff the sum of $2,156,064.00 in charterer hire and other payments due to the Plaintiff from the Defendant under the terms

3

of the SWIBER CONCORD Charter.

      12.  By reason of the aforesaid, the Plaintiff has suffered damages in the amount of $2,156,064.00, and the Plaintiff is entitled to interest, attorneys' fees and costs as set forth below.

      13.  The Plaintiff has started arbitration in Singapore against the Defendant as provided in the SWIBER GLORIOUS Charter.  Arbitrators in Singapore customarily award interest, legal fees and arbitration costs to the prevailing party.

PLAINTIFF'S DAMAGES

      14.  As best as can now be estimated, Plaintiff expects to recover the following amounts from Defendant:

| | | |
|---|---|---|
| A. | Principal claim: | |
| | First Cause of Action: | $6,132,784.47 |
| | Second Cause of Action: | $2,156,064.00 |
| | Total Principal Claim | $8,288,848.47 |
| B. | 3 years interest at 6% per annum: | $1,491,992.73 |
| C. | Legal fees and arbitration costs: | $250,000.00 |
| | Total: | $10,030,841.20 |

4

### DEFENDANT NOT FOUND WITHIN THE DISTRICT

15.    The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, property within this District subject to the jurisdiction of this Court, held in the hands of garnishees including, but not limited to, ABN Amro Bank NV, American Express Bank, Bank Leumi, Bank of America, Bank of China, Bank of Communications Co. Ltd. New York Branch, Bank of India, Bank of New York, Barclays Bank, BNP Paribas, Calyon, Citibank, Commerzbank, Deutsche Bank, HSBC (USA) Bank, J.P. Morgan Chase, Standard Chartered Bank, State Bank of India, Societe Generale, UBS AG and/or Wachovia Bank.

16.    The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia,* any property of the Defendant held by the aforesaid garnishees for the purpose of obtaining personal jurisdiction over the Defendant, and to secure Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against the

5

Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint;

B.    That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all tangible or intangible property in whatever form or any other funds held by any garnishee, including, but not limited to, ABN Amro Bank NV, American Express Bank, Bank Leumi, Bank of America, Bank of China, Bank of Communications Co. Ltd. New York Branch, Bank of India, Bank of New York, Barclays Bank, BNP Paribas, Calyon, Citibank, Commerzbank, Deutsche Bank, HSBC (USA) Bank, J.P. Morgan Chase, Standard Chartered Bank, State Bank of India, Societe Generale, UBS AG and/or Wachovia Bank, in the amount of $10,030,841.20 to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

C.    That this Court retain jurisdiction over this matter through the entry of any judgment associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof; and

D.    That the Plaintiff have such other, further and different relief as the Court may deem just and proper.

Dated:    New York, New York
          September 9, 2009

                        CARDILLO & CORBETT
                        Attorneys for Plaintiff
                        Swiber Offshore Construction Pte.Ltd.

                By: _____
                        Francis H. McNamara (FM4649)

7

**ATTORNEY'S VERIFICATION**

State of New York )
                  ) ss.:
County of New York)

  1. My name is Francis H. McNamara.

  2. I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

  3. I am associated with the firm of Cardillo & Corbett, attorneys for the Plaintiff.

  4. I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

  5. The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

  6. The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff's attorneys in Singapore.

  7. I am authorized to make this Verification on behalf of the Plaintiff.

           Francis H. McNamara

Sworn to before me this
9th day of September, 2009

NOTARY PUBLIC

CHRISTOPHIL B. COSTAS
Notary Public, State of New York
No. 31-0773693
Qualified in New York County
Commission Expires April 30, 2011

8

# Exhibit 1

| 1. Place and date<br><br>Singapore.... 29th MAY 2009 | UNIFORM TIME CHARTER PARTY<br>FOR OFFSHORE SERVICE VESSELS<br>CODE NAME: "SUPPLYTIME 89"<br><br>PART I |
|---|---|

| 2. Owners/Place of business (full style,address and telex no.) (Cl. 1(a))<br><br>SWIBER OFFSHORE CONSTRUCTION Pte Ltd.<br>12 International Business Park<br>Cyberhub@IBP #03-02, Singapore 609920<br>TEL +65-6505-0800<br>FAX +65-6505-0801 | 3. Charterers/Place of business  (full style, address and telefax no.) (Cl. 1(a))<br><br>LIKPIN INTERNATIONAL LTD<br>Representative Office 13-02,<br>13 Floor City Tower 1, Sheikh Zayed Rd., Dubai<br>United Arab Emirates<br>TEL. +971-4-3328242; FAX  +971-4-3327494 |
|---|---|

| 4. Vessel's name (Cl. 1(a))<br><br>SWIBER CONCORD (the "Vessel") plus two (2) Anchor Handling Tugs, one not less than 5,000 bhp, to be nominated by the Owner, both being suitable in all respects to support the Vessel in service under this Charter Party. | 5. Date of delivery (Cl. 2(a))<br>5th June 2009 | 6. Cancelling date (Cl. 2(a) and (c))<br><br>12th June 2009 |
|---|---|---|

| 7. Port or place of delivery (Cl.2 (a))<br><br>Offshore Work location Nam Rong Field, S.R. Vietnam being the point where an arriving vessel to the field would release the tow line and drop first anchor at Lat 9 deg 26 min N, Long 107 deg  49 min E . | 8. Port or place of redelivery/notice of redelivery (Cl. 2(d)) |
|---|---|
| | (i)Port or place of redelivery<br><br>Offshore Work location Nam Rong Field, S.R. Vietnam. |
| | (ii)Number of days' notice of redelivery<br><br>Ten (10) days or job completion |

| 9. Period of hire (Cl.1(a))<br><br>Firm Hire period of 40 days.<br><br>Following completion of the Nam Rong & Doi Moi Project, in the event the Charterers' are awarded further pipelay or subsea construction contracts in Vietnamese waters, which scope of work is within the Vessel's capabilities, the Parties hereby agree that the period of hire shall be extended for such period required to complete the additional scope of work subject to receipt of advance notice in Box 10 (ii) as set out herein. | 10. Extension of period of hire (optional) (Cl. 1(b)) |
|---|---|
| | (i)Period of extension<br><br>Twenty (20) days + five (5) days + five (5) days + five (5) days in Charterer's option. |
| | (ii) Advance notice for declaration of option (days)<br><br>Fifteen (15) days |

| 11. Automatic extension period to complete voyage or well (Cl.1(c)) | 12. Mobilisation charge (lump sum and when due) (Cl. 2(b)(i)) |
|---|---|
| (i)Voyage or well (state which)<br><br>Construction of Offshore Pipeline "Nam Rong & Doi Moi Project | (i) Lump Sum<br><br>US$1,300,000 (US Dollars one million three hundred thousand.) or US$1,400,000 (US Dollars one million four hundred thousand) if period of extension as set out in Box 10(i) is less than thirty (30) days. |
| (ii)Maximum extension period (state number of days)<br><br>Mutual agreement | (ii) When due<br><br>Upon delivery per Box 7 |
| | 13. Port or place of mobilisation (Cl. 2(b)(i))<br><br>Singapore Port or any port nearer to the vessel. |

| 14. Early termination of charter (state amount of hire payable) (Cl. 26(a))<br><br>Fifteen (15) days.. | 15. Number of days' notice of early termination (Cl. 26(a))<br><br>Fifteen (15) days | 16. Demobilisation charge (lump sum) (Cl. 2(e) and Cl. 26(a))<br><br>US$1,000,000 (United States Dollars One Million) or US$1,200,000 (United States Dollars One Million Two Hundred Thousand) if  period of extension as set out in Box 10(i) is less than thirty (30) days |
|---|---|---|

| 17. Area of operation (Cl. 5(a))<br><br>South China Sea within S.R. Vietnam waters. | 18. Employment of vessel restricted to (state nature of service(s)) (Cl. 5(a))<br>Offshore construction and support, exclusive of Fire Fighting and Well Blow-Out support unless otherwise agreed. |
|---|---|

(continued)

(continued)        "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels        PART I

| | |
|---|---|
| **19. Charter hire (state rate and currency) (Cl. 10(a) and (d))**<br><br>US$135,000/- per day, total three vessel per Box 4, reduced to US$130,000/- per day retroactive to commencement of Charter if period of extension as set out in Box 10(i) exceeds 30 days.. | **20. Extension hire (if agreed, state rate) (Cl. 10(b))**<br><br>As per Box 19. |
| **21. Invoicing for hire and other payments (Cl. 10(d))**<br><br>**(i)state whether to be issued in advance or arrears**<br><br>Invoices to be issued in arrears every 14 days, from Delivery per Box 7, payable within 14 days.<br><br>**(ii)state to whom to be issued if addressee other than stated in Box 2**<br><br>**(iii)state to whom to be issued if addressee other than stated in Box 3.** | **22. Payments (state mode and place of payment; also state beneficiary and bank account) (Cl. 10(e))**<br><br>CITIBANK NA<br>Singapore Branch<br>Account No.: 0-823703-015<br>SWIFT Code: CITISGSG<br>Beneficiary name: Swiber Offshore Construction Pte Ltd |

| | | |
|---|---|---|
| **23. Payment of hire, bunker invoices and disbursements for Charterers' account (state maximum number of days) (Cl.10(e))**<br><br>Fourteen (14) days | **24. Interest rate payable (Cl. 10(e))**<br><br>1% per month | **25. Maximum audit period (Cl. 10(f))**<br><br>One (1) year |

| | | |
|---|---|---|
| **26. Meals (state rate agreed) (Cl. 5(c)(i))**<br>US$25.00 per man per day (refer Additional Clause 3) | **27.Accommodation (state rate agreed) (Cl. 5(c)(i))**<br><br>Not applicable | **28. Mutual Waiver of Recourse (optional, state whether applicable) (Cl. 12(f))**<br><br>Applicable |

| | |
|---|---|
| **29. Sublet (state amount of daily increment to charter hire) (Cl. 17(b))**<br>Not Applicable. | **30. War (state name of countries) (Cl. 19(e))**<br><br>Vietnam |
| **31. General average (place of settlement – only to be filled in if other than London) (Cl. 21)**<br><br>Singapore | **32. Breakdown (state period) (Cl. 26(b) (v))**<br><br>48 hours per calendar month. |
| **33. Law and arbitration (state Cl. 31(a) or 31(b) or 31(c), as agreed; if Cl. 31(c) agreed also state place of arbitration) (Cl. 31)**<br><br>Cl. 31(c) - Singapore Laws and Arbitration in Singapore. | **34. Numbers of additional clauses covering special provisions, if agreed**<br><br>As per ANNEX B |
| **35. Names and addresses for notices and other communications required to be given by the Owners (Cl. 28)**<br><br>Swiber Offshore Construction Pte Ltd.<br>12 International Business Park<br>Cyberhub@IBP #04-01, Singapore 609920<br>Tel. # +65-6505-0800<br>Fax # +65-6505-0801 | **36. Names and addresses for notices and other communications required to be given by the Charterers (Cl.28)**<br><br>Likpin International Ltd,<br>Representative Office 13-02<br>13 Floor, City Tower 1, Sheikh Zayed Rd., Dubai, UAE<br>Tel. # +971-4-3328242<br>Fax # +971-4-3327494 |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Charter consisting of PART I, including additional clauses if any agreed and stated in Box 34, and PART II as well as ANNEX "A" to "E" as annexed to this Charter. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "E" to the extent of such conflict but no further.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

## ADDITIONAL CLAUSES

### 1. Pipe Lay Systems Trial

Prior to delivery of the Vessel, the Owner shall, at their time and expense, demonstrate readiness for effective operation, to both end user and Charterer, by satisfactorily demonstrating by trials the ability of the Pipe Lay Systems. The Pipe Lay Systems Trial shall be a demonstration of the ability of the pipe lay systems (conveyors, ready rack, line-up station, tension machines) to operate effectively and in harmony with the anchor systems (winches and tower controls), welding of the pipe shall not be a determinant in the Trail.

The Charterer shall procure permission from the relevant Vietnamese authorities for the Pipe Lay System Trial to be carried out in Vietnamese waters at a location to be nominated by Charterers as reasonably proximal as possible to Vung Tau and/or the work site and the Pipe Lay System Trial shall be conducted in the presence of an independent Marine Surveyor (intention Braemar Falconer Vietnam Company, Vung Tau, Vietnam; all costs of which shall be for the Owners account) and shall involve two separate consecutive trials.

The first trial shall be a timed trial and shall demonstrate the functionality of the winches and tower controls whereby the Vessel shall simulate the laying of joints of pipe and be on an 8 point spread mooring under circumstances where the vessel has its 2 x lead anchors run short, and its 2 x stern anchors run long, requiring re-runs.

The timed trial shall demonstrate that the vessel is capable of performing a twelve (12) meter pull in not more than ninety (90) seconds, consecutively to simulate the laying of sixteen (16) joints.

Such timed trial to be evidenced by a Statement of Fact issued by the attending Independent Marine Surveyor,

The second trail shall not be a timed trial and shall satisfactorily demonstrate the ability of the Pipe Lay Systems (conveyors, ready rack, line-up station, tension machines) to operate effectively and in harmony with the anchor systems (winches and tower controls) by laying up to thirty (30) joints. However, the Charterer may elect to reduce the actual number of joints laid by notifying the Owners at site.

### 2. On Hire Survey

Following the issuance of the Statement of Fact as set out in Clause 1 herein above, additional to the customary On-hire Survey pursuant Part II Clause 4 herein, the Owner shall furnish test and calibration records with respect to:

Crawler Cranes in service onboard (2)

Davits to be used, or in service onboard

Tension Machines (2)

A&R Winch (1)

Anchor Winches (8)

Additionally the Owner shall furnish a Suitability Study and Basis of Offshore Service De-Rating of the Crawler Crane.

### 3. Daily Charter Hire Box 19

Box 19 Daily Charter Hire is Inclusive of:

Owners Crew as listed herein;

Two (2) Anchor Handling Tugs, one not less than 5,000 bhp, to be nominated by the Owner, both being suitable in all respects to support the Vessel in service under this Charter Party

Pipe Lay Barge (the Vessel) ready in all respects to commence pipe lay operations save equipment, personnel and materials identified as Charterers supply items herein.

D8" and D12" internal Line-Up Clamps

Non-construction slings, shackles and rigging appliances operated from or used by Vessel crane

Suitable gangway

Suitable fenders for receiving and keep 80 m pipe barges alongside.

Suitable FRC (Fast Rescue Craft)

Suitable Pollution Response Kit

The Box 19 Daily Charter Hire is exclusive of:

Fuel and lubricants for all vessels nominated in Box 4, as more specifically defined in Part II Clause 8 (a).

All taxes of any kind in levied in or by S.R. of Vietnam in connection with the Charter.

Catering services to Charterer and Client personnel and their sub-contractors which shall be provided by the Owner, on the basis of USD$25/man/day, for such persons onboard.

### 4. Charterers Supply

The Charter shall provide and pay for:

Customs and Immigration clearance as may be required to permit the Vessel and two anchor handling tugs to commence Pipe Lay Systems Trials and/or work in Vietnamese waters shall be the Charterers responsibility and at the Charterers expense. In connection with the provision of such services, the Charterer shall notify the Owner of the documentary requirements required to complete such services in advance of Vessel and two anchor handling tugs entry into Vietnamese waters and the Owner shall furnish to the Charter such documentation in a timely manner so as to permit the Charterers to carry out these services without delay.

The Owner grants to the Charterer twelve (12) hours free time to complete customs and immigration clearance for the Vessel and the two anchor handling tugs from the time the Vessel drops anchor at the Charterers nominated co-ordinates in Vietnamese waters whereafter the expiration of the twelve (12) hours free time the Vessel and the two anchor handling tugs shall be deemed on-hire except in the following circumstances:

a) The Owner fails to provide the documents requested by the Charterer prior to Vessel and the two anchor handling tugs entering Vietnamese waters thereby impeding Charterers obtaining customs and immigration clearance and/or;
b) Owners setting-up arrangements and Pipe Lay System Trials are permitted to commence at the time the Vessel drops anchor at the Charterers nominated co-ordinates in Vietnamese waters in which case the twelve (12) hours free time shall commence only upon completion of Pipe Lay Systems Trail;

In both events, time and cost of the Vessel and the two anchor handling tugs shall be for the Owners account and the Vessel and the two anchor handling tugs shall not be deemed on-hire.

Pilot, berthing, port charges, berthing stevedoring, and provide ships agent services as more specifically defined in Part II, Clauses (a),(b) and (c), levied against Owner vessel in connection with the Charter. Other than required to perform any sea trials and or inspection works prior to on hire.

Crew change transportation services by helicopter and /or supply boat from the offshore location, to the Port of Vung Tau, and onward land/river transportation to the nearest international airport, being Ho Chi Minh City, (and visa versa) and related documentary clearances. These services shall be provided on an *equivalent status basis* as Charterers own personnel. Owner shall use his best efforts to minimize the crew changes, and co-operate where possible with scheduled service arrangements.

It is agreed for up to forty five (45) days following delivery of the Vessel there will be no requirement for crew change for Owner's supplied personnel however following the expiration of the first forty five (45) days following delivery of the Vessel, the provisions of Clause 5 (Optional Services) shall apply.

All load-out, transportation, logistics related to the re-supply and waste disposal from the Port of Vung Tau to the offshore location (and visa versa), so long as the Owner shall supply all chiller-freezer-food containers, all liquid and solid waste bins, skips and tanks.

Emergency Medical Evacuation of Owners crew, to the admitting onshore hospital within S.R Vietnam.

All things related or to be incorporated in the Work, including but not limited to installation engineering, procedures, personnel qualification, materials, consumables, industrial gases etc .

Satellite communication (provided by Owner) charges, other than for ship business (at cost + 10%).

PPE other than issued to Owners Crew.

Weather forecasting services.

Project Insurance and related deductibles.

Owner Medic shall provide first aid and initial emergency medical treatment, for all personnel on board the Vessel(s). Charterer shall provide Vietnamese male nurse to assist Owners Medic in dealing with Charters Vietnamese speaking crew.

### 5. Owners Crew and Optional Services

The Owners Time Charter crew, in accordance with the intent of the original tender documents related to this Charter:

| Position | Quantity |
|---|---|
| Superintendent | 1 |
| HSE Officer | 1 |
| Administrators | 2 |
| Doctor | 1 |
| Deck Foreman | 2 |
| Anchor Foreman | 2 |
| Tower Operators | 4 |
| Tension Machine Operators | 2 |
| below Deck, Galley and Catering. | Not Quantified (as required to perform duties for normal and acceptable |



operations)

### Optional Services.

Additionally the Owner offers to provide as optional services, the following personnel, Subcontractors services and equipment. These optional services shall be provided as a separate services to this charter arrangement as they are third party services and not part of Owner's personnel or equipment. Charterer can elect to obtain these services directly and requested prior to mobilisation with fourteen (14) days.

### Optional Additional Crew

| Position | Quantity | Unit Rate US$ per day | Total US$ per day | Mob/Demob |
|----------|----------|-----------------------|-------------------|-----------|
| Senior Welder Foreman | 1 | 650 | 650 | Refer Notes 1 |
| Welder Foreman | 3 | 209 | 627 | Refer Notes 1 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Notes:
1.  Mob- demob for addl. Crew requested by LIKPIN (Charterer) shall be payable by Charterer to Owner as actual cost incurred from point of origin+5%. Day rate for crew shall be payable from their point of origin.
2.  Crew change for provided crew will occur in 60 days and will be payable by Charterer as actual cost to point of origin/destination +5%. Day Rate shall also be paid up to point of destination.

6.  **Payment Terms and Letter(s) of Credit –**

    a.  One day prior to the estimated date of arrival of the Vessel at the Port or Place of Delivery as set out in Box 7 herein, the Charterer shall establish a Letter of Credit, in a form and from a bank acceptable to the Owner, issued by the Charterer's bank in favour of the Owner for an amount equivalent US $1,300,000 (United States Dollars One Million Three Hundred Thousand) being the lump sum Mobilisation Charge as set out in Box 12(i) herein;

    b.  Charter Hire payments as set out in Box 19 herein shall be made by the Charterer to the Owner against the following documents:

        (i)  For Fixed Invoices:
            - Invoice.
            - Working statement summary duly signed by both parties.

        (ii)  For Variable Invoices
            - Invoice
            - Accommodation summary statement.
            - Other services charged with proper supporting duly signed

    A Letter of Credit, in a form and from a bank acceptable to the Owner, shall be issued by the Charterer's bank in favour of the Owner for an amount equivalent to fourteen (14) days hire. The validity of the Letter of Credit shall be for fifty five (55) days from the Date of Delivery.

    The Letter of Credit shall contain a provision whereby in the event that the Charterer fails to provide the evidence of payment of due hire within fourteen (14) days from the date upon which the hire falls due, the Owner shall be entitled to draw against the Letter of Credit without notification to the Charterer, subject to presentation to the negotiating bank the original invoice and working statement summary duly signed by both parties, as set out in Clause 6b(i) herein, for the period for which due hire has not been paid.

    In such event, the Charterer shall, within seven (7) days from the date upon which the Owners draw against the original Letter of Credit, established a new Letter of Credit in the same amount and on the same terms against which the Owner may draw at such future date in the event the Charterer fails to provide evidence of payments as aforesaid

    Should the Charterer exercise optional period/s as provided for in Box 10 herein, the Charterer shall arrange for an extension of the Letter of Credit for a period commensurate with the period of extension.

7. **Suspension of Hire**

    For the purposes of this Clause it is explicitly agreed that the Charter Hire set out in Box 19 herein is for the Vessel and two (2) anchor handling tugs.

    Furthermore, it is explicitly agreed that the Vessel and each of the two anchor handling tugs shall be assigned individual Charter Hire rates in the amount of:

    Vessel:                  US $121,000 (United States Dollars One Hundred and Twenty One Thousand )/day
    Anchor Handling Tug 1:   US $7,000 (United States Dollars Seven Thousand)/day
    Anchor Handling Tug 2:   US $7,000 (United States Dollars Seven Thousand)/day

    For the purposes of Suspension of Hire as set out in Part II, Clause 11 of this Agreement, the Vessel and each of the two anchor handling tugs shall be considered as divisible and separate whereby suspension of hire shall apply only to that vessel which fails to be and capable of providing the intended service under this Charter Party and the amount of suspended hire shall be calculated by reference to the assigned individual Charter hire set out herein.

Notwithstanding the foregoing, in the event suspension of hire applies simultaneously to Anchor Handling Tug 1 and Anchor Handling Tug 2 whereby the Vessel is rendered unable to continue pipe lay operations, hire for the Vessel shall be automatically reduced to a standby rate of US $80,000 (United States Dollars Eighty Thousand)/day and the full rate shall only re-apply once either one of Anchor Handling Tug 1 or Anchor Handling Tug 2 is returned to service.

With regard to the Vessel, subject to owners supplying sufficient spare line-up clamps for uninterrupted pipe laying operations, it is explicitly agreed between the Charterer and the Owner that failure of an internal line-up clamp shall not constitute cause to suspend the hire of the Vessel.

**8. Law and Arbitration (Box 33 and Cl. 31 (c))**

For clarity of the Arbitration process, the following shall apply:

Arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC") for the time being in force.

The tribunal shall consist of three arbitrators. Each Party shall appoint one arbitrator, and the two arbitrators shall jointly appoint the third arbitrator. In the event that the arbitrators appointed by the parties cannot agree on the appointment of the third arbitrator, then the third arbitrator shall be appointed by the Chairman of the SIAC.

The language of the arbitration shall be English and the decision of the arbitrators shall be final and binding on the parties. The parties hereby expressly waive any rights of appeal that they might have under any applicable law against the decision of the arbitrators.

**9. Liabilities and Indemnities**

The Owner shall not be responsible for loss or damage to the projects and related works of such projects contemplated in this Charter Party even if such loss or damage is caused wholly or partially by the act, neglect or default of the Owners, its affiliates, subsidiaries, their employees, contractors or subcontractors. The Charterer shall hereby indemnify, defend and hold harmless Owners, its parent, affiliates and subsidiaries from any and all claims, costs, expenses, actions, proceedings, suits, demands and liabilities whatsoever arising out of or in connection with such loss or damage.



ANNEX "A" to Uniform Time Charter Party for Offshore Service Vessels
Code Name "SUPPLYTIME 89" – dated 01st MARCH 2009

**VESSEL SPECIFICATION**





ANNEX "B" to Uniform Time Charter Party for Offshore Service Vessels
Code Name "SUPPLYTIME 89" – dated 01ˢᵗ MARCH 2009

## INSURANCE

Insurance policies (as applicable) to be procured and maintained by the Owners under Clause 14:

(1) *Marine Hull Insurance.*- Hull and Machinery Insurance shall be provided with limits equal to those normally carried by the Owners for the Vessel.

(2) *Protection and Indemnity (Marine Liability) Insurance.*

Protection and Indemnity or Marine Liability insurance shall be provided for the Vessel with a limit equal to the value under paragraph 1 above or U.S. $5 million, whichever is greater, and shall include but not be limited to coverage forcrew liability, third party bodily injury and property damage liability, including collision liability, towers liability (unless carried elsewhere).

(3) *General Third Party Liability Insurance.* – Coverage shall be for:
Bodily Injury                    per person
Property Damage              per occurrence.

(4) *Workmen's Compensation and Employer's Liability Insurance for Employees.* – Covering non-employees for statutory benefits as set out and required by local law in area of operation or area in which the Owners may become legally obliged to pay benefits.

(5) *Comprehensive General Automobile Liability Insurance.* – Covering all owned, hired and non-owned vehicles, Coverage shall be for:
Bodily Injury According to the local law.
Property Damage    In an amount equivalent to single limit per occurrence.

(6) Such other insurances as may be agreed.





ANNEX "C" to Uniform Time Charter Party for Offshore Service Vessels
Code Name "SUPPLYTIME 89" – dated 01" MARCH 2009

## AGREEMENT FOR MUTUAL INDEMNITY AND WAIVER OF RECOURSE
*(Optional, only applicable if stated in Box 28 in PART I)*

This Agreement is made between the Owners and the Charterers and is premised on the following:

(a) The Charterers and the Owners have entered into a contract or agreement dated as above regarding the performance of work or service in connection with the Charterers' operations offshore ("Operations");

(b) The Charterers and the Owners have entered into, or shall enter into, contracts or agreements with other contractors for the performance of work or service in connection with the Operations;

(c) Certain of such other contractors have signed, or may sign, counterparts of this Agreement or substantially similar agreements relating to the operations ("Signatory" or collectively "signatories"); and

(d) The Signatories wish to modify their relationship at common law and avoid entirely disputes as to their liabilities for damage or injuries to their respective property or employees;

In consideration of the premises and of execution of reciprocal covenants by the other Signatories, the Owners agree that:

1. The Owners shall hold harmless, defend, indemnify and waive all rights of recourse against the other Signatories and the irrespective subsidiary and affiliate companies, employees, directors, officers, servants, agents, invitees, vessel(s) and insurers, from and against any and all claims, demands, liabilities or causes of action of every kind and character, in favour of any person or party, for injury to, illness or death of any employee of the Owners (or in possession of the Owners by virtue of an arrangement made with an entity which is not a Signatory) which injury, illness, death, damage or loss arises out of the Operations, and regardless of the cause of such injury, illness, death, damage or loss even though caused in whole or in part by a pre-existing defect, the negligence, strict liability or other legal fault of other Signatories.

2. The Owners (including the Vessel) shall have no liability whatsoever for injury, illness or death of any employee of another Signatory under the Owners' direction by virtue of an arrangement made with such other Signatory, or for damage to or loss of property of another Signatory in the Owners' possession by virtue of an arrangement made with such other Signatory. In no event shall the Owners (including the Vessel) be liable to another Signatory for any consequential damages whatsoever arising out of or in connection with the performance or non-performance of this Agreement, including, but not limited to, loss of use, loss of profits, shut-in or loss of production and cost of insurance.

3. The Owners undertake to obtain from their insurers a waiver of rights of subrogation against all other Signatories in accordance with the provisions of this Agreement governing the mutual liability of the Signatories with regard to the Operations.

4. The Owners shall attempt to have those of their subcontractors which are involved in the Operations become Signatories and shall promptly furnish the Charterers with an original counterpart of this Agreement or of a substantially similar agreement executed by its subcontractors.

5. Nothing contained in this Agreement shall be construed or held to deprive the Owners or the Charterers or any other Signatory as against any person or party, including as against each other, of any right to claim limitation of liability provided by any applicable law, statute or convention, save that nothing in this Agreement shall create any right to limit liability. Where the Owners or the Charterers or any other Signatory may seek an indemnity under the provisions of this Agreement as against each other in respect of a claim brought by a third party, the Owners or the Charterers or any other Signatory shall seek to limit their liability against such third party.

6. The Charterers shall provide the Owners with a copy of every counterpart of this Agreement or substantially similar agreement which is executed by another Signatory pertaining to the Operations, and shall, in signing this, and in every counterpart of this Agreement, be deemed to be acting as agent or trustee for the benefit of all Signatories.

7. This Agreement shall inure to the benefit of and become binding on the Owners as to any other Signatories on the later of the date of execution by the Owners and the date of execution of a counterpart of this Agreement or a substantially similar agreement by such other Signatory pertaining to the Operations.

8. Any contractor, consultant, sub-contractor, etc., performing work or service for the Charterers or another Signatory in connection with the Operations which has not entered into a formal contract for the performance of such work or service may nevertheless become a Signatory by signing a counterpart of this Agreement or a substantially similar agreement which shall govern, as to the subject of this Agreement, the relationship between such new Signatory and the other Signatories and also by extension its relations with the Charterers.

9. This Agreement may be executed in any number of counterparts or substantially similar agreements as necessary but all such counterparts shall together constitute one legal instrument.





ANNEX  "D" to Uniform Time Charter Party for Offshore Service Vessels
Code Name  "SUPPLYTIME 89" – dated 01st MARCH 2009



**1. Period**

(a) The Owners stated in Box 2 let and the Charterers stated in Box 3 hire the Vessel named in Box 4, as specified in ANNEX "A", (hereinafter referred to as "the Vessel"), for the period as stated in Box 9 from the time the Vessel is delivered to the Charterers.

(b) Subject to Clause 10(b), the Charterers have the option to extend the Charter Period in direct continuation for the period stated in Box 10(i), but such an option must be declared in accordance with Box 10(ii)

(c) The Charter Period shall automatically be extended for the time required to complete the voyage or well (whichever is stated in Box 11(i)) in progress, such time not to exceed the period stated in Box 11(ii).

**2. Delivery and Redelivery**

(a)*Delivery.* – Subject to sub-clause (b) of this Clause the Vessel shall be delivered by the Owners free of cargo and with clean tanks at any time between the date stated in Box 5 and the date stated in Box 6 at the port or place stated in Box 7 where the Vessel can safely lie always afloat

(b) *Mobilisation.* – (i) The Charterers shall pay a lump sum as stated in Box 12 without discount by way of mobilisation charge in consideration of the Owners giving delivery at the port or place stated in Box 7 The mobilisation charge shall not be affected by any change in the port or place of mobilisation but stated in Box 13.

(ii) Should the Owners agree to the Vessel loading and transporting cargo and/or undertaking any other service for the Charterers en route to the port of delivery or from the port of redelivery, then all terms and conditions of this Charter Party shall apply to such loading and transporting and/or other service exactly as if performed during the Charter Period excepting only that any lump sum freight agreed in respect thereof shall be payable on shipment or commencement of the service as the case may be, the Vessel and/or goods lost or not lost.

(c) *Cancelling.* – If the Vessel is not delivered by midnight local time on the cancelling date stated in Box 6, the Charterers shall be entitled to cancel this Charter Party However, if despite the exercise of due diligence by the Owners, the Owners will be unable to deliver the Vessel by the cancelling Date, they may give notice in writing to the Charterers at any time prior to the delivery date as stated in Box 6, and shall state in such notice the date by which they will be able to deliver the Vessel, The Charterers may within 24 hours of receipt of such notice give notice in writing to the Owners cancelling this Charter Party. If the Charterers do not give such notice, then the later date specified in the Owners' notice shall be substituted for the cancelling date for all the purposes of this Charter Party In the event the Charterers cancel the Charter Party, all such termination on terms that neither party shall be liable to the other for any losses incurred by reason of the non-delivery of the Vessel or the cancellation of the Charter Party.

(d) *Redelivery.* – The Vessel shall be redelivered on the expiration or earlier termination of this Charter Party free of cargo and with clean tanks at the port or place as stated in Box 8(i) or such other port or place as may be mutually agreed The Charterers shall give not less than the number of days notice in writing of their intention to redeliver the Vessel, as stated in Box 8(ii)

(e) *Demobilisation.* – The Charterers shall pay a lump sum without discount in the amount as stated in Box 16 by way of demobilisation charge which amount shall be paid on the expiration or on earlier termination of this Charter Party.

**3. Condition of Vessel**

(a) The Owners undertake that at the date of delivery under this Charter Party the Vessel shall be of the description and classification as specified in ANNEX "A" attached hereto, and undertake to so maintain the Vessel during the period of service under this Charter Party.

(b) The Owners shall before and at the date of delivery of the Vessel and throughout the Charter Period exercise due diligence to make and maintain the Vessel tight, staunch, strong in good order and condition and, without prejudice to the generality of the foregoing, in every way fit to operate effectively at all times for the services as stated in Clause 6.

**4. Survey**

The Owners and the Charterers shall jointly appoint an independent surveyor for the purpose of determining and agreeing in writing the condition of the Vessel, any anchor handling and towing equipment specified in Section 5 of ANNEX "A", and the quality and quantity of fuel, lubricants and water at the time of delivery and redelivery hereunder, The Owners and the Charterers shall jointly share the time and expense of such surveys.

**5. Employment and Area of Operation**

(a) The Vessel shall be employed in offshore activities which are lawful in accordance with the law of the place of the Vessel's flag and/or registration and of the place of operation, Such activities shall be restricted to the service(s) as stated in Box 19, and to voyages between any good and safe port or place and any place or offshore unit where the Vessel can safely lie always afloat within the Area of Operation as stated in Box 17 which shall always be within Institute Warranty Limits and which shall in no circumstances be exceeded without prior agreement and adjustment of the Hire and in accordance with such other terms as appropriate to be agreed; provided always that the Charterers do not warrant the safety of any such port or place or offshore unit but shall exercise due diligence in issuing their orders to the Vessel as if the Vessel were their own property and having regard to her capabilities and the nature of her employment, Unless otherwise agreed, the Vessel shall not be employed as a diving platform.

(b) Relevant permission and licences from responsible authorities for the Vessel to enter, work in and leave the Area of Operation shall be obtained by the Charterers and the Owners shall assist, if necessary, in every way possible to secure such permission and licences ,

(c) *The Vessel's Space.* – The whole reach and burden and decks of the Vessel shall throughout the Charter Period be at the Charterers' disposal reserving proper and sufficient space for the Vessel's Master, Officers' Crew, tackle, apparel, furniture, provisions and stores, The Charterers shall be entitled to carry, so far as space is available and for their purposes in connection with their operations:

(i)    Persons other than crew members, other than fare paying, and for such purposes to make use of the Vessel's available accommodation not being used on the voyage by the Vessel's Crew, The Owners shall provide suitable provisions and requisites for such persons for which the Charterers shall pay at the rate as stated in Box 25 per meal and at the rate as stated in Box 27 per day for the provision of bedding and services for personnel using berth accommodation,

**(ii)** Lawful cargo whether carried on or under deck,

**(iii)** Explosives and dangerous cargo, whether in bulk or packaged, provided proper notification has been given and such cargo is marked and packed in accordance with the national regulations of the Vessel and/or the International Maritime Dangerous Goods Code and/or other pertinent regulations, Falling such proper notification, marking or packing the Charterers shall indemnify the Owners in respect of any loss, damage or liability whatsoever and howsoever arising therefrom, The Charterers accept responsibility for any additional expenses (including reinstatement expenses) incurred by the Owners in relation to the carriage of explosives and dangerous cargo

**(iv)** Hazardous and noxious substances, subject to Clause 12(g), proper notification and any pertinent regulations

(d) *Laying-up of Vessel* - The Charterers shall have the option of laying up the Vessel at an agreed safe port or place for all or any portion of the Charter Period in which case the Hire hereunder shall continue to be paid but, if the period of such lay-up exceeds 30 consecutive days there shall be credited against such Hire the amount which the Owners shall reasonably have saved by way of reduction in expenses and overheads as a result of the lay up of the Vessel ,

**6. Master and Crew**

(a) (i) The Master shall carry out his duties promptly and the Vessel shall render all reasonable services within her capabilities by day and by night and at such times and on such schedules as the Charterers may reasonably require without any obligations of the Charterers to pay to the Owners or the Master, Officers or the Crew of the Vessel any excess or overtime payments The Charterers shall furnish the Master with all instructions and sailing directions and the Master and Engineer shall keep full and correct logs accessible to the Charterers or their agents.

(ii) The Master shall sign cargo documents as and in the form presented, the same, however, not to be Bills of Lading, but receipts which shall be non negotiable documents and shall be marked as such. The Charterers shall indemnify the Owners against all consequences and liabilities arising from the Master, Officers or agents signing, under the direction of the Charterers, those cargo documents or other documents inconsistent with this Charter Party or from any irregularity in the papers supplied by the Charterers or their agent.

(b) The Vessel's Crew if required by Charterers will connect and disconnect electric cables, fuel, water and pneumatic hoses when placed on board the Vessel in port as well as alongside the offshore units; will operate the machinery on board the Vessel for loading and unloading cargoes; and will hook and unhook cargo on board the Vessel when loading or discharging alongside offshore units if the port regulations or the seaman and/or labour unions do not permit the Crew of the Vessel to carry out any of this work, then the Charterers shall make, at their own expense, whatever other arrangements may be necessary, always under the direction of the Master.

(c) If the Charterers have reason to be dissatisfied with the conduct of the Master or any Officer or member of the Crew the Owners on receiving particulars of the complaint shall promptly investigate the matter and if the complaint proves to be well founded, the Owners shall as soon as reasonably possible make appropriate changes in the appointment

(d) The entire operation, navigation, and management of the Vessel shall be in the exclusive control and command of the Owners, their Master, Officers and Crew. The Vessel will be operated and the services hereunder will be rendered as requested by the Charterers, subject always to the exclusive right of the Owners or the Master of the Vessel to determine whether operation of the Vessel may be safely undertaken. In the performance of the Charter Party, the Owners are deemed to be an independent contractor, the Charterers being concerned only with the results of the services performed.

**7. Owners to Provide**

(a) The Owners shall provide and pay for all provisions, wages and all other expenses of the Masters, Officers and Crew; all maintenance and repair of the Vessel's hull, machinery and equipment as specified in ANNEX "A"; also, except as otherwise provided in this Charter Party, for all insurance on the Vessel, all dues and charges directly related to the Vessel's flag and/or registration, all deck, cabin and engineer room stores, cordage required for ordinary ship's purposes mooring alongside in harbour, and all fumigation expenses and de-ratisation certificates. The Owners, obligations under this Clause extend to cover all liabilities for consular charges appertaining to the Master, Officers and Crew, customs or import duties arising at any time during the performance of this Charter Party in relation to the personal effects of the Master, Officers and Crew, and in relation to the stores, provisions and other matters as aforesaid which the Owners are to provide and/or pay for and the Owners shall refund to the Charterers any sums they or their agents may have paid or been compelled to pay in respect of such liability

(b) On delivery the Vessel shall be equipped, if appropriate, at the Owners, expense with any towing and anchor handling equipment specified in Section 5(b) of ANNEX "A", if during the Charter Period any such equipment becomes lost, damaged or unserviceable, other than as a result of the Owners, negligence, the Charterers shall either provide, or direct the Owners to provide, an equivalent replacement at the Charterers' expense

**8.    Charterers to Provide**

(a) While the Vessel is on hire the Charterers shall provide and pay for all fuel, lubricants, water dispersants, firefighting foam and transport thereof, port charges, pilotage and boatmen and canal steersmen (whether compulsory or not), launch hire (unless incurred in connection with the Owners, business), light dues, tug assistance, canal, dock, harbour, tonnage and other dues and charges, agencies and commissions incurred on the Charterers' business, costs for security or other watchmen, and of quarantine (if occasioned by the nature of the cargo carried or the ports visited whilst employed under this Charter Party but not otherwise)

(b) At all times the Charterers shall provide and pay for the loading and unloading of cargoes so far as not done by the Vessel's crew, clearing of cargo tanks, all necessary dunnage, uprights and shoring equipment for securing deck cargo, all cordage except as to be provided by the Owners, all ropes, slings and special runners (including bulk cargo discharge hoses) actually used for loading and discharging, tarps required for the protection of cargo, and electrodes used for offshore works, and shall reimburse the Owners for the actual cost of replacement of special mooring lines to offshore units, wires, nylon spring lines etc used for offshore work, all hose connections and adaptors, and further, shall refill oxygen/acetylene bottles used for offshore works.

(c) The Charterers shall pay for customs duties, all permits, import duties

"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels                          **PART II**

(including costs involved in establishing temporary or permanent importation          204
bonds), and clearance expenses, both for the Vessel and/or equipment,          205
required for or arising out of this Charter Party.          206

207

**9. Bunkers**

Unless otherwise agreed, the Vessel shall be delivered with bunkers and          208
lubricants as on board and redelivered with sufficient bunkers to reach the          209
next bunkering stage en route to her next port of call. The Charterers upon          210
delivery and the Owners upon redelivery shall take over and pay for the          211
bunkers and lubricants on board at the prices prevailing at the times and          212
ports of delivery and redelivery.          213

214

**10. Hire and Payments**

(a) Hire.- The Charterers shall pay Hire for the Vessel at the rate stated in Box          215
19 per day or pro rata for part thereof from the time that the Vessel is delivered          216
to the Charterers until the expiration or earlier termination of this Charter 2          217
Party.          218

(b) Extension Hire. - If the option to extend the Charter Period under Clause          219
f(b) is exercised, Hire for such extension shall, unless stated in Box 20, be          220
mutually agreed between the Owners and the Charterers.          221

(c) Adjustment of Hire. The rate of hire shall be adjusted to reflect          222
documented changes, after the date of entering into the Charter Party or the          223
date of commencement of employment, whichever is earlier, in the Owner          224
costs arising from changes to the Charterers, requirements or regulations          225
governing the Vessel and/or its Crew or this Charter Party.          226

(d) Invoicing. – All invoices shall be issued in the contract currency stated in          227
Box 19. In respect of reimbursable expenses incurred in currencies other          228
than the contract currency, the rate of exchange into the contract currency          229
shall be that quoted by the Central Bank of the country of such other currency          230
as at the date of the Owners' invoice. Invoices covering Hire and any other          231
payments due shall be issued monthly as stated in Box 21(i) or at the          232
expiration or earlier termination of this Charter Party. Notwithstanding the          233
foregoing, bunkers and lubricants on board at delivery shall be invoiced at          234
the time of delivery.          235

(e) Payments. – Payments of Hire, bunker invoices and disbursements for the          236
Charterers' account shall be received within the number of days stated in Box          237
23 from the date of receipt of the invoice. Payment shall be made in the          238
contract currency in full without discount to the account stated in Box 22.          239
However any advances for disbursements made on behalf of and approved by          240
the Owners may be deducted from Hire due.          241
If payment is not received by the Owners within 6 banking days following the          242
due date the Owners are entitled to charge interest at the rate stated in Box 24          243
on the amount outstanding from and including the due date until payment is          244
received.          245

When an invoice or disbursement for the Charterers shall in any event pay the          246
undisputed portion of the invoice but shall be entitled to withhold payment of          247
the disputed portion provided that such portion is reasonably disputed and          248
the Charterers specify such reason. Interest will be chargeable at the rate          249
stated in Box 24 on such disputed amounts where resolved in favour of the          250
Owners. Should the Owners prove the validity of the disputed portion of the          251
invoice, balance payment shall be received by the Owners within 6 banking          252
days after the dispute is resolved Should the Charterers, claim be valid, a          253
corrected invoice shall be issued by the Owners.          254

In default of payment as herein specified, the Owners may require the          255
Charterers to make payment of the amount due within 6 banking days of          256
receipt of notification from the Owners; failing which the Owners shall have          257
the right to withdraw the Vessel without prejudice to any claim the Owners          258
may have against the Charterers under this Charter Party.          259
While payment remains due the Owners shall be entitled to suspend the          260
performance of any and all of their obligations hereunder and shall have no          261
responsibility whatsoever for any consequences thereof, in respect of which          262
the Charterers hereby indemnify the Owners, and Hire shall continue to          263
accrue and any extra expenses resulting from such suspension shall be for          264
the Charterers' account.          265

(f) Audit. – The Charterers shall have the right to appoint an independent          266
chartered accountant to audit the Owners, books directly related to work          267
performed under this Charter Party at any time after the conclusion of the          268
Charter Party, up to the expiry of the period stated in Box 25, to determine the          269
validity of the Owners' charges hereunder. The Owners undertake to make          270
their records available for such purposes at their principal place of business          271
during normal working hours. Any discrepancies discovered in payments          272
made shall be promptly resolved by invoice or credit as appropriate.          273

274

**11. Suspension of Hire**

(a) If as a result of any deficiency of Crew or of the Owners, stores, strike of          275
Master Officers and Crew, breakdown of machinery, damage to hull or other          276
accidents to the Vessel, the Vessel is prevented from working, no Hire shall be          277
payable in respect of any time lost and any Hire paid in advance shall be          278
adjusted accordingly provided always however that Hire shall not cease in the          279
event of the Vessel being prevented from working as aforesaid as a result of          280

(i)     the carriage of cargo as noted in Clause 5(c)(iii) and (iv);          281
(ii)    quarantine or risk of quarantine unless caused by the Master, Officers or          282
        Crew having communication with the shore at any infected area not in          283
        connection with the employment of the Vessel without the consent or the          284
        instructions of the Charterers;          285
(iii)   deviation from her Charter Party duties or exposure to abnormal risks at          286
        the request of the Charterers;          287
(iv)    detention in consequence of being driven into port or to anchorage          288
        through stress of weather or trading to shallow harbours or to river or          289
        ports with bars or suffering an accident to her cargo, when the expenses          290
        resulting from such detention shall be for the Charterers, account          291
        howsoever incurred;          292
(v)     detention or damage by Ice;          293
(vi)    any act or omission of the Charterers, their servants or agents.          294
(b)   Liability for Vessel not Working.- The Owners, liability for any loss,          295
damage or delay sustained by the Charterers as a result of the Vessel being          296
prevented from working by any cause whatsoever shall be limited to          297
suspension of hire.          298

(c) Maintenance and Drydocking.- Notwithstanding sub-clause(a) Following          299
60 days of continuous hire and, the Charterers shall grant the Owners a          300
period, of 24 hours on hire, which shall be cumulative, per month or pro rata          301
in respect of a month from the commencement of the Charter Period for maintenance          302
Any repairs including drydocking (hereinafter referred to as "maintenance          303
The Vessel shall be drydocked at regular intervals. The Charterers shall place          304

the Vessel at the Owners, disposal clean of cargo, at a port (to be nominated          305
by the Owners at a later date) having facilities suitable to the Owners for the          306
purpose of such drydocking.          307
During reasonable voyage time taken in transits between such port and Area          308
of Operation the Vessel shall be on hire and such time shall not be counted          309
against the accumulated maintenance allowance.          310
Hire shall be suspended during any time taken in maintenance repairs and          311
drydocking in excess of the accumulated maintenance allowance.          312
In the event of less time being taken by the Owners for repairs and drydocking          313
or, alternatively, the Charterers not making the Vessel available for all or part          314
of this time, the Charterers shall, upon expiration or earlier termination of the          315
Charter Party, pay the equivalent of the daily rate of Hire then prevailing in          316
addition to Hire otherwise due under this Charter Party. In respect of all such          317
time not so taken or made available.          318
Upon commencement of the Charter Period, the Owners agree to furnish the          319
Charterers with the Owners, proposed drydocking schedule and the          320
Charterers agree to make every reasonable effort to assist the Owners in          321
adhering to such predetermined drydocking schedule for the Vessel          322

323

**12. Liabilities and Indemnities**

(a) Owners.- Notwithstanding anything else contained in this Charter Party          324
excepting Clause 5(c)(iii),7(b),9(b),13(g),15(e)and 21,the Charterers shall          325
not be responsible for loss of or damage to the property of the Owners or of          326
their contractors and sub-contractors, including the Vessel, or for personal          327
injury or death of the employees of the Owners or of their contractors and          328
sub-contractors, arising out of or in any way connected with the performance          329
of this Charter Party even if such loss, damage, injury or death is caused          330
wholly or partially by the act, neglect, or default of the Charterers, their          331
employees, contractors or sub-contractors, and even if such loss, damage,          332
injury or death is caused wholly or partially by unseaworthiness of any vessel :          333
and the Owners shall indemnify, protect, defend and hold harmless the          334
Charterers from any and against all claims, costs, expenses, actions,          335
proceedings, suits, demands and liabilities whatsoever arising out of or in          336
connection with such loss, damage, personal injury or death          337

(b) Charterers.- Notwithstanding anything else contained in this Charter          338
Party excepting Clause 21, the Owners shall not be responsible for loss of          339
damage to, or any liability arising out of anything towed by the Vessel, any          340
cargo laden upon or carried by the Vessel or her tow, the property of the          341
Charterers or of their contractors and sub contractors, including their          342
offshore units, or for personal injury or death of the employees of the          343
Charterers or of their contractors and sub-contractors (other than the Owners          344
and their contractors and sub-contractors) or of anyone on board anything          345
towed by the Vessel, arising out of or in any way connected with the          346
performance of this Charter Party even if such loss, damage, liability, injury          347
or death is caused wholly or partially by the act, neglect or default of the          348
Owners, their employees, contractors or sub contractors, and even if such          349
loss, damage, liability, injury or death is caused wholly or partially by the          350
unseaworthiness of any vessel; and the Charterers shall indemnify, protect,          351
defend and hold harmless the Owners from any and against all claims, costs,          352
expenses, actions, proceedings, suits, demands, and liabilities whatsoever          353
arising out of or in connection with such loss, damage, liability, personal          354
injury or death          355

(c) Consequential Damages. - Neither party shall be liable to the other for and          356
each party hereby agrees to protect, defend and indemnify the other against          357
any consequential damages whatsoever arising out of or in connection with          358
the performance or non-performance of this Charter Party, including, but not          359
limited to loss of use, loss of profits, shut in or loss of production and cost of          360
insurance          361

(d) Limitations.- Nothing contained in this Charter Party shall be construed or          362
held to deprive the Owners or the Charterers, as against any person or party,          363
including as against each other of any right to claim limitation of liability          364
provided by any applicable law, statute or convention, save that nothing in          365
this Charter Party shall create any right to limit liability. Where the Owners or          366
the Charterers may seek an indemnity under the provisions of this Charter          367
Party or against each other in respect of a claim brought by a third party, the          368
Owners or the Charterers shall seek to limit their liability against such third          369
party          370

(e) Himalaya Clause.- (i) All exceptions, exemptions, defences, immunities,          371
limitations of liability, indemnities, privileges and conditions granted or          372
provided by this Charter Party or by any applicable statute, rule or regulation          373
for the benefit of the Charterers shall also apply to and be for the benefit of the          374
Charterers, parent, affiliated, related and subsidiary companies; the          37/
Charterers, contractors sub-contractors, clients, joint ventures and joint          37L
venture owners (always with respect to the job or project on which the Vessel          377
is employed); their respective employees and their respective underwriters.          378
(ii) All exceptions, exemptions, defences, immunities, limitations of liability,          379
indemnities, privileges and conditions granted or provided by this Charter          380
Party or by any applicable statute rule or regulation for the benefit of the          381
Owners shall also apply to and be for the benefit of the Owners, parent,          382
affiliated, related and subsidiary companies, the Owners, sub contractors,          383
the Vessel, its Master Officers and Crew its registered owner, its operator, its          384
demise charterer(s) their respective employees and their respective          385
underwriters          386
(iii) The Owners or the Charterers shall be deemed to be acting as agent or          387
trustee of and for the benefit of all such persons and parties set forth above,          388
but only for the limited purpose of contracting for the extension of such          389
benefits to such persons and parties          390
(f) Mutual Waiver of Recourse (Optional  only applicable if stated in Box 28, but          391
regardless of whether this option is exercised the other provisions of Clause 12          392
shall apply and shall be paramount)          393
In order to avoid disputes regarding liability for personal injury or death of          394
employees or for loss of or damage to property the Owners and their          395
employees or for loss of or damage to property the Charterers agree to enter into an          396
Agreement for Mutual Indemnity and Waiver of Recourse (in a form          397
substantially similar to that specified in ANNEX "C") between the Owners, the          398
Charterers and the various contractors and sub-contractors of the Charterers          399
(g) Hazardous and Noxious Substances.- Notwithstanding any other          400
provision of this Charter Party to the contrary, the Charterers shall always be          401
responsible for any losses, damages or liabilities suffered by the Owners,          402
their employees, contractors or sub-contractors, by the Charterers, or by          403
third parties, with respect to the Vessel or other property personal injury or          404
death, pollution or otherwise, which losses, damages or liabilities are caused          405
directly or indirectly, as a result of the Vessel's carriage of any hazardous and          406
noxious substances in whatever form as ordered by the Charterers, and the          407
Charterers shall defend, indemnify the Owners and hold the Owners harmless          408
for any expense, loss or liability whatsoever or howsoever arising with          409
respect to the carriage of hazardous or noxious substances          410



"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels          **PART II**

### 13. Pollution

(a) Except as otherwise provided for in Clause 15(c)(iii), the Owners shall be liable for, and agree to indemnify, defend and hold harmless the Charterers against, all claims, costs, expenses, actions, proceedings, suits, demands and liabilities whatsoever arising out of actual or potential pollution damage and the cost of cleanup or control thereof arising from acts or omissions of the Owners or their personnel which cause or allow discharge, spills or leaks from the Vessel, except as may emanate from cargo thereon or therein.

(b) The Charterers shall be liable for and agree to indemnify, defend and hold harmless the Owners from all claims, costs, expenses, actions, proceedings, suits, demands, liabilities, loss or damage whatsoever arising out of or resulting from any other actual or potential pollution damage, even where caused wholly or partially by the act, neglect or default of the Owners, their employees, contractors or sub-contractors or by the unseaworthiness of the Vessel.

### 14. Insurance

(a)(i) The Owners shall procure and maintain in effect for the duration of this Charter Party, with reputable insurers, the insurances set forth in ANNEX "B". Policy limits shall not be less than those indicated. Reasonable deductibles are acceptable and shall be for the account of the Owners Charterers.
(ii) The Charterers shall upon request be named as co-insured. The Owners shall upon request cause insurers to waive subrogation rights against the Owners (as encompassed in Clause 12(e)(iii). Co insurance and/or waivers of subrogation shall be given only insofar as these relate to liabilities which are properly the responsibility of the Owners under the terms of this Charter Party.
(b) The Owners shall upon request furnish the Charterers with certificates of insurance which provide sufficient information to verify that the Owners have complied with the insurance requirements of this Charter Party.
(c) If the Owners fail to comply with the aforesaid insurance requirements, the Charterers may without prejudice to any other rights or remedies under this Charter Party, purchase similar coverage and deduct the cost thereof from any payment due to the Owners Charterers under this Charter Party.

### 15. Saving of Life and Salvage

(a) The Vessel shall be permitted to deviate for the purpose of saving life at sea without prior approval of or notice to the Charterers and without loss of Hire provided however that notice of such deviation is given as soon as possible.
(b) Subject to the Charterers, consent, which shall not be unreasonably withheld, the Vessel shall be at liberty to undertake attempts of salvage, it being understood that the Vessel shall be off Hire from the time she leaves port or commences to deviate and she shall remain off hire until she is again in every way ready to resume the Charterers, service at a position which is not less favourable to the Charterers than the position at the time of leaving port or deviating for the salvage service.
All salvage monies earned by the Vessel shall be divided equally between the Owners and the Charterers, after deducting the Master's, Officers, and Crew's share, legal expenses, value of fuel and lubricants consumed, Hire of the Vessel lost by the Owners during the salvage, repairs to damage sustained, if any, and any other extraordinary loss or expense sustained as a result of the salvage.
The Charterers shall be bound by all measures taken by the Owners in order to secure payment of salvage and to fix its amount.
(c) The Owners shall waive their right to claim any award for salvage performed on property owned by or contracted to the Charterers, always provided such property was the object of the operation the Vessel was chartered for and the Vessel shall remain on hire when rendering salvage services to such property This waiver is without prejudice to any right the Vessel's Master, Officers and Crew may have under any title.
If the Owners render assistance to such property in distress on the basis of "no claim for salvage" then, notwithstanding any other provisions contained in this Charter Party and even in the event of neglect or default of the Owners, Master, Officers or Crew.
  (i)  The Charterers shall be responsible for and shall indemnify the Owners against payments made, under any legal rights, to the Master Officers and Crew in relation to such assistance.
  (ii) The Charterers shall be responsible for and shall reimburse the Owners for any loss or damage sustained by the Vessel or her equipment by reason of giving such assistance and shall also pay the Owners' additional expenses thereby incurred.
  (iii) The Charterers shall be responsible for any actual or potential spill, seepage and/or emission of any pollutant howsoever caused occurring within the offshore site and any pollution resulting therefrom, wheresoever it may occur and including but not limited to the cost of such measures as are reasonably necessary to prevent or mitigate pollution damage, and the Charterers shall indemnify the Owners against any liability cost or expense arising by reason of such actual or potential spill, seepage and/or emission.
  (iv) The Vessel shall not be off-Hire as a consequence of giving such assistance, or effecting repairs under sub-paragraph (ii) of this sub clause, and time taken for such repairs shall not count against time granted under Clause 11(c).
  (v) The Charterers shall indemnify the Owners against any liability cost and/or expense whatsoever in respect of any loss of life, injury, damage or other loss to person or property howsoever arising from such assistance.

### 16. Lien

The Owners shall have a lien upon all cargoes for all claims against the Charterers under this Charter Party and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned. The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel Except as provided in Clause 12, the Charterers shall indemnify and hold the Owners harmless against any lien of whatsoever nature arising upon the Vessel during the Charter Period while she is under the control of the Charterers, and against any claims against the Owners arising [out of] the operation of the Vessel by the Charterers or out of any [conduct] [of the] Charterers in relation to the Vessel or the operation thereof. Should the Vessel be arrested by reason of claims or liens arising out of her operation hereunder unless brought about by the act or neglect of the

### 17. Sublet and Assignment

(a) Charterers. – The Charterers shall have the option of subletting, assigning or loaning the Vessel to any person or company not co-operating with the Owners, subject to the Owners' prior approval which shall not be unreasonably withheld, upon giving notice in writing to the Owners, but the original Charterers shall always remain responsible to the Owners for due performance of the Charter Party and contractors of the person or company taking such subletting, assigning or loan shall be deemed contractors of the Charterers for all the purposes of this Charter Party. The Owners make it a condition of such consent that additional Hire shall be paid as agreed between the Charterers and the Owners having regard to the nature and period of any intended service of the Vessel.
(b) If the Vessel is sublet, assigned or loaned to undertake rig anchor handling and/or towing operations connected with equipment, other than that used by the Charterers, then a daily increment to the Hire in the amount as stated in Box 29 or pro rata shall be paid for the period between departures for such operations and return to her normal duties for the Charterers.
(c) Owners. – The Owners may not assign or transfer any part of this Charter Party without the written approval of the Charterers, which approval shall not be unreasonably withheld.
Approval by the Charterers of such subletting or assignment shall not relieve the Owners of their responsibility for due performance of the part of the services which is sublet or assigned.

### 18. Substitute Vessel

The Owners shall be entitled at any time, whether before delivery or at any other time during the Charter Period, to provide a substitute vessel, subject to the Charterers. prior approval which shall not be unreasonably withheld.

### 19. War

(a) Unless the consent of the Owners be first obtained, the Vessel shall not be ordered nor continue to any port or place or on any voyage nor be used on any service which will bring the Vessel within a zone which is dangerous as a result of any actual or threatened act of war, war, hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or state whatsoever, revolution, civil war civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any government or rulers.
(b) Should the Vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (i) the Owners shall be entitled from time to time to insure their interest in the Vessel for such terms as they deem fit up to its open market value and also in the Hire against any of the risks likely to be involved thereby, and the Charterers shall make a refund on demand of any additional premium thereby incurred, and (ii) notwithstanding the terms of Clause 11 Hire shall be payable for all time lost including any loss owing to loss of or injury to the Master, Officers, Crew or passengers or to refusal by any of them to proceed to such zone or to be exposed to such risks (c) In the event of additional insurance premiums being incurred as the wages of the Master and/or Officers and/or Crew and/or the cost of provisions and or stores for deck and/or engine room being increased by reason of or during the existence of any of the matters mentioned in sub-clause (a) the amount of any additional premium and/or increase shall be added to the Hire, and paid by the Charterers on production of the Owners, account therefor, such account being rendered monthly.
(d) The Vessel shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other way whatsoever given by the government of the nation under whose flag the Vessel sails or any other government or any person (or body) acting or purporting to act with the authority of such government or by any committee or person having under the terms of the war risks insurance on the Vessel the right to give any such orders or directions.
(e) In the event of the outbreak of war (whether there be a declaration of war or not) between any of the countries stated in Box 30 or in the event of the nation under whose flag the Vessel sails becoming involved in war (whether there be a declaration of war or not) either the Owners or the Charterers may terminate this Charter Party, whereupon the Charterers shall redeliver the Vessel to the Owners in accordance with PART I If it has cargo on board after discharge thereof at destination or, if debarred under this Clause from reaching or entering it, at a near open and safe port or place as directed by the Owners, or if the Vessel has no cargo on board, at the port or place at which it then is or if at sea at a near, open and safe port or place as directed by the Owners. In all cases Hire shall continue to be paid and, except as aforesaid, all other provisions of this Charter Party shall apply until redelivery.
(f) If in compliance with the provisions of this Clause anything is done or is not done, such shall not be deemed a deviation.
The Charterers shall procure that all Bills of Lading (if any) issued under this Charter Party shall contain the stipulations contained in sub-clauses (a), (d) and (f) of this Clause.

### 20. Excluded Ports

(a) The Vessel shall not be ordered to nor bound to enter without the Owners, written permission (a) any place where fever or epidemics are prevalent or to which the Master, Officers and Crew by law are not bound to follow the Vessel; (b) any ice-bound place or any place where lights, lightships, marks and buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival or where there is risk that ordinarily the Vessel will not be able on account of ice to reach the place or to get out after having completed her operations. The Vessel shall not be obliged to force ice nor to follow an icebreaker. If, on account of ice, the Master considers it dangerous to remain at the loading or discharging place for fear of the Vessel being frozen in and/or damaged, he has liberty to sail to a convenient open place and await the Charterers, fresh instructions.
(b) Should the Vessel approach or be brought or ordered within such place, or be exposed in any way to the said risks, the Owners shall be entitled from time to time to insure their interests in the Vessel and/or Hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand.



Notwithstanding the terms of Clause 11 Hire shall be paid for all time lost including any fuel owing to loss of or sickness or injury to the Master, Officers, Crew or passengers or to the action of the Crew in refusing to proceed to such place or to be exposed to such risks.    612
613
614
615

### 21. General Average and New Jason Clause

General Average shall be adjusted and settled in London unless otherwise stated in Box31, according to York/Antwerp Rules,1974, as may be amended. Hire shall not contribute to General Average. Should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply;    617
618
619
620
621

'In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, loss or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo.    622
623
624
625
626
627
628
629
630

If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the Owners before delivery'.    631
632
633
634
635
636

### 22. Both-to-Blame Collision Clause

If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owners in the navigation or the management of the Vessel, the Charterers will indemnify the Owners against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represent loss of or damage to, or any claim whatsoever of the owners of any goods carried under this Charter Party paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set off recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than or in addition to the colliding ships or objects are at fault in respect of a collision or contact.    637
638
639
640
641
642
643
644
645
646
647
648
649

### 23. Structural Alterations and Additional Equipment

The Charterers shall have the option of at their expense, making structural alterations to the Vessel or installing additional equipment with the written consent of the Owners which shall not be unreasonably withheld but unless otherwise agreed the Vessel is to be redelivered reinstated, at the Charterers, expense, to her original condition. The Vessel is to remain on hire during any period of these alterations or reinstatement. The Charterers, unless otherwise agreed, shall be responsible for repair and maintenance of any such alteration or additional equipment.    650
651
652
653
654
655
656
657
658

### 24. Health and Safety

The Owners shall comply with and adhere to all applicable international, national and local regulations pertaining to health and safety, and such Charterers, instructions as may be appended hereto.    659
660
661
662

### 25. Taxes

Each party shall pay taxes due on its own profit, income and property. The Charterers shall pay all other taxes and dues arising out of the operation or use of the Vessel during the Charter Period.    663
664
665

In the event of change in the Area of Operation or change in local regulation and/or interpretation thereof, resulting in an unavoidable and documented change of the Owners, tax liability after the date of entering into the Charter Party or the date of commencement of employment, whichever is the earlier Hire shall be adjusted accordingly.    666
667
668
669
670
671
672

(a) For Charterers' Convenience - The Charterers may terminate this Charter Party at any time by giving the Owners written notice as stated in Box 15 and by paying the settlement stated in Box 14 and the demobilisation charge stated in Box 16, as well as Hire or other payments due under the Charter Party.    673
674
675
676
677

(b) For Cause. - If either party becomes informed of the occurrence of any event described in this Clause that party shall notify the other party promptly in writing and in any case within 3 days after such information is received. If the occurrence has not ceased within 3 days after such notification has been given, this Charter Party may be terminated by either party without prejudice to any other rights which either party may have, under any of the following circumstances:    678
679
680
681
682
683
684

(i) Requisition. - If the government of the state of registry and/or the flag of the Vessel, or any agency thereof requisitions for hire or title or otherwise takes possession of the Vessel during the Charter Period.    685
686
687

(ii) Confiscation. - If any government, individual or group, whether or not purporting to act as a government or on behalf of any government, confiscates, requisitions, expropriates, seizes or otherwise takes possession of the Vessel during the Charter Period.    688
689
690
691

(iii) Bankruptcy - In the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of either party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed or if it suspends payment or ceases to carry on business.    692
693
694
695
696

(iv) Loss of Vessel - If the Vessel is lost, actually or constructively or missing, unless the Owners provide a substitute vessel pursuant to Clause 16. In the case of termination, Hire shall cease from the date the Vessel was lost or in the event of a constructive total loss, from the date of the event giving rise to such loss if the date of loss cannot be ascertained or the Vessel is missing, payment of Hire shall cease from the date the Vessel was last reported.    697
698
699
700
701
702
703

(v) Breakdown. - If, at any time during the term of this Charter Party, a    704

---

breakdown of the Owners, equipment or Vessel results in the Owners' being unable to perform their obligations hereunder for a period exceeding that stated in Box 32, unless the Owners provide a substitute vessel pursuant to Clause 16.    705
706
707
708

(vi) Force Majeure - If a force majeure condition as defined in Clause 27 prevails for a period exceeding 15 consecutive days.    709
710
711

(vii) Default - If either party is in repudiatory breach of its obligations thereunder.    712
713

Termination as a result of any of the above mentioned causes shall not relieve the Charterers of any obligation for Hire and any other payments due.    714
715

### 27. Force Majeure.

Neither the Owners nor the Charterers shall be liable for any loss, damages or delay or failure in performance hereunder resulting from any force majeure event, including but not limited to acts of God, fire, action of the elements, epidemics, war (declared or undeclared), warlike action, insurrection, revolution or civil strife, piracy, civil war or hostile action, strikes or differences with workmen (except for disputes relating solely to the Owners, or the Charterers, employees), acts of the public enemy, federal or state laws, rules and regulations of any governmental authorities having or asserting jurisdiction in the premises or of any other group, organisation or informal association (whether or not formally recognised as a government), and any other cause beyond the reasonable control of either party which makes continuance of operations impossible.    716
717
718
719
720
721
722
723
724
725
726
727

### 28. Notices and Invoices

Notices and invoices required to be given under this Charter Party shall be given in writing to the addresses stated in Boxes 21, 25 and 28 as appropriate.    728
729
730
731

### 29. Wreck Removal

If the Vessel sinks and becomes a wreck and an obstruction to navigation and has to be removed upon request by any compulsory law or authority having jurisdiction over the area where the wreck is placed, the Owners shall be liable for any and all expenses in connection with the raising, removal, destruction, lighting or marking of the wreck.    732
733
734
735
736
737

### 30. Confidentiality

All information or data obtained by the Owners in the performance of this Charter Party is the property of the Charterers, is confidential and shall not be disclosed without the prior written consent of the Charterers. The Owners shall use their best efforts to ensure that the Owners, any of their sub contractors, and employees and agents thereof shall not disclose any such information or data.    738
739
740
741
742
743

### 31. Law and Arbitration

*(a) This Charter Party shall be governed by English law and any dispute arising out of this Charter Party shall be referred to arbitration in London, one arbitrator being appointed by each party, in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. On the receipt by one party of the nomination in writing of the other party's arbitrator that party shall appoint their arbitrator within 14 days, failing which the arbitrator already appointed shall act as sole arbitrator. If two arbitrators properly appointed shall not agree they shall appoint an umpire whose decision shall be final.*    744
745
746
747
748
749
750
751
752
753
754

*(b) Should any dispute arise out of this Charter Party, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, this agreement may be made a rule of the Court. The arbitrators shall be members of the Society of Maritime Arbitrators, Inc of New York and the proceedings shall be conducted in accordance with the rules of the Society.*    755
756
757
758
759
760
761

*(c)Any dispute arising out of this Charter Party shall be referred to arbitration at the place stated in Box 33 subject to the law and procedures applicable there.*    762
763
764

(d) If Box 33 in PART II is not filled in, sub-clause(a) of this Clause shall apply.    765

*(a), (b) and (c) are alternatives; state alternative agreed in Box 33.*    766

### 32. Entire Agreement

This is the entire agreement of the parties, which supersedes all previous written or oral understandings and which may not be modified except by a written amendment signed by both parties.    767
768
769
7[?]

### 33. Severability Clause

If any portion of this Charter Party is held to be invalid or unenforceable for any reason by a court or governmental authority of competent jurisdiction, then such portion will be deemed to be stricken and the remainder of this Charter Party shall continue in full force and effect.    771
772
773
774

### 34 Demise

Nothing herein contained shall be construed as creating a demise of the Vessel to the Charterers.    775
776
777

### 35 Definitions

"Well" is defined for the purposes of this Charter Party as the time required to drill, test, complete and/or abandon a single borehole including any side-track thereof.    778
779
780
781

"Offshore unit" is defined for the purposes of this Charter Party as any vessel, offshore installation, structure and/or mobile unit used in offshore exploration, construction, dredging or repair, exploitation or production    782
783
784

"Offshore site" is defined for the purposes of this Charter Party as the area within three nautical miles of an 'offshore unit' from or to which the Owners are requested to take their Vessel by the Charterers.    785
786
787

"Employees" is defined for the purposes of this Charter Party as employees, directors, officers, servants, agents or invitees.    788
789

### 36. Headings

The headings of this Charter Party are for identification only and shall not be deemed to be part hereof or be taken into consideration in the interpretation or construction of this Charter Party.    790
791
792
793



| ⬢ **Swiber** | **NAM RONG DOI MOI PROJECT** | | | |
|---|---|---|---|---|
| | **Swiber Concorde - Charter** | | | |
| | **PROJECT NO.** | **AMENDMENT** | **DATE** | **PAGE** |
| | C8500 | 2 | 07/07/09 | Page 1 of 1 |

### AMENDMENT / MODIFICATION

#### AMENDMENT No. 2

Pursuant to the Charter Party Agreement for the hire of the 'Swiber Concorde' dated 29 May 2009, each of Likpin International Ltd (Likpin) and Swiber Offshore Construction Pte Ltd (SOC) confirm and agree that the Charter Party is hereby amended as follows, with such amendment taking effect as of the Effective Date listed below:

| **Description of the Amendment/Modification** | *Provision of Construction Crew onboard the Swiber Concorde.* |
|---|---|
| Charterer have requested for the following construction crew to be provided by Owner to Charterer as follows: <br>• Crane Operator:    (4 off)    USD $226 per man per day <br>• Rigger Foreman:    (2 off)    USD $204 per man per day <br>• Riggers:    (14 off)    USD $75 per man per day <br>• Line-up Operators:    (2 off)    USD $198 per man per day | |
| **Effective Date** | 08 June 2009 |

Likpin and SOC acknowledge and agree that except as modified herein, the terms of the Charter Party (including any prior amendments or modifications) remain the same and the parties continue to be bound fully by the Charter Party as so modified.

**SIGNED for and on behalf of Likpin International Ltd:**

SIGNATURE:    ..........................

Name (in capitals):    ALAN ROBERTS

Position (in capitals):    PROJECT MANAGER

Date:    ..........................

**SIGNED for and on behalf of Swiber Offshore Construction Pte Ltd:**

SIGNATURE:    ..........................

Name (in capitals):    NITISH GUPTA

Position (in capitals):    CEO

Date:    ..........8/7/09..........

*Amendment No 2 Rev 0.doc*

| ⬗ **Swiber** | **NAM RONG DOI MOI PROJECT** | | | |
|---|---|---|---|---|
| | **Swiber Concorde - Charter** | | | |
| | PROJECT NO. | AMENDMENT | DATE | PAGE |
| | C8500 | 3 | 12/08/09 | Page 1 of 1 |

**AMMENDMENT NO. 3**

Pursuant to the Charter party Agreement for the hire of the " Swiber Concorde" dated 29 May 2009, each of Likpin Internatuonal Ltd ( Likpin) and Swiber Offshore Construction Pte Ltd (SOC) confirm and agree that the Charter Party is hereby amended as follows, with such amendment taking effect as the Effective Date Listed below:

| Description of the Amendment/Modification | Change of Adress as per Clause 28, Notices and Invoices (Notices and Invoices required to be given under this Charyter Party shall be given in writing to the addresses stated in Box 21, 35 and 36 as appropriate) in compliance to the LC Requirement. |
|---|---|
| **OLD ADDRESS:** | LIKPIN INTERNATONAL LTD<br>Representative office 13-02<br>13 Floor City Tower 1, Shelkk Zayed Rd., Dubai<br>United Arab Emirates |
| **NEW REVISED ADDRESS:** | ATLAS MARITIME LLC<br>PO BOX 32737, Dubai<br>United Arab Emirates |

LIKPIN and SOC acknowledge and agree that except as modified herein, the terms of the Charter Party (including any prior amendments or modifications) remain the same and the parties continue to be bound fully by the Charter Party as so modified.

SIGNED F for and on behalf of Likpin International Ltd:

SIGNATURE:            .................................................

Name ( in capitals): M. SHOURIDEH

Position (in capitals):        PROJECT MANAGER

Date:                .................................................

SIGNED  for and on behalf of Swiber Offshore Construction Pte Ltd:

SIGNATURE:            .................................................

Name ( in capitals): NITISH GUPTA

Position (in capitals):        CEO

Date:                .................................................

Mr S.
Ditto..
Au
11/8/09

**Amendment No. 01 to Charter Party agreements dated the 29ᵗʰ May 2009 and 7ᵗʰ July 2009**

SWIBER OFFSHORE CONSTRUCTION Pte Ltd (the "Owner") and LIKPIN INTERNATIONAL LTD entered into to Charter Party Agreements dated 29 May 2009 and 7 July 2009 respectively ("Charter Party Agreements") to charter Swiber Concord and Swiber Glorious.

The parties on this day the 21ˢᵗ August 2009 have agreed to amend the Charter Party Agreements as follows:

It is hereby mutually agreed between the parties ("The Owner") SWIBER OFFSHORE CONSTRUCTION Pte Ltd and the sole charterer LIKPIN INTERNATIONAL LTD that the charterer shall be PETECHIM JSC and LIKPIN INTERNATIONAL LTD a Consortium (having its place of business at 7th Floor Citylight Tower, 45 Vo Thi Sau Street District 1,Ho Chi Minh City, Vietnam. Tel:+84 839106952, Fax: +84 839106938) and that PETECHIM JSC and LIKPIN INTERNATIONAL LTD hereinafter ("The Charterer") shall be jointly and severally liable for the due and proper performance of all of the charterers obligations set out in the Charter Party Agreement from 21ˢᵗ August 2009, without limitation but excluding works performed and invoiced to LIKPIN INTERNATIONAL LTD, prior to the 21ˢᵗ of August 2009, which Petechim JSC shall not be responsible for.

It is further agreed between the parties with respect to Fixed and Variable Invoices issued by "The Owner" and notwithstanding "The Charterer" rights under this Charter Party Agreement that from the date of signing this amendment all and any invoices irrespective of whether such invoices are agreed, in dispute or have fallen due will in part become due a further 28 days from the previous due date or earlier where possible.

Furthermore it was agreed that "The Charterer" is relieved from issuing any forms of securities or Letters of Credit and that all and any invoices will be subject to joint verification by PETECHIM JSC and LIKPIN INTERNATIONAL LTD and that all payments will be made in cash by telegraphic transfer through LIKPIN INTERNATIONAL LTD, however in the case any payments are made via PETECHIM JSC on behalf of the Consortium, then it is further agreed that "The Charterer" will deduct from any invoice to a maximum of 5.28% a tax deduction under the provisions of Vietnamese Law for CIT Taxes and provide such receipts as issued by the receiving tax department.


Signature (Owners)

SWIBER-OFFSHORE
CONSTRUCTION Pte Ltd


Name:
　　DARREN YEO

Position:
　　G-D


Signature (Charterer)

LIKPIN INTERNATIONAL LTD


Name: Shou r dy


Position: M - D


Signature (Charterer)

PETECHIM JSC


Name:　HOANG DUONG

Position:　CHAIRMAN



# Exhibit 2

| 1. Place and date<br><br>Singapore, 7th July 2009 | UNIFORM TIME CHARTER PARTY<br>FOR OFFSHORE SERVICE VESSELS<br>CODE NAME: "SUPPLYTIME 89"<br><br>PART I |
|---|---|

| 2. Owners/Place of business (full style,address and telex no.) (Cl. 1(a))<br><br>SWIBER OFFSHORE CONSTRUCTION Pte Ltd.<br>12 International Business Park<br>Cyberhub@IBP #03-02, Singapore 609920<br>TEL +65-6505-0800<br>FAX +65-6505-0801 | 3. Charterers/Place of business  (full style, address and telefax no.) (Cl. 1(a))<br><br>LIKPIN INTERNATIONAL LTD<br>Representative Office 13-02,<br>13 Floor City Tower 1, Sheikh Zayed Rd., Dubai<br>United Arab Emirates<br>TEL. +971-4-3326242; FAX  +971-4-3327494 |
|---|---|

| 4. Vessel's name (Cl. 1(a))<br><br>SWIBER GLORIOUS (the "Vessel") plus one (1) Anchor Handling Tug, not less than 4,000 bhp and to be less than ten (10) years old on commencement, to be nominated by the Owner, being suitable in all respects to support the Vessel in service under this Charter Party. | 5. Date of delivery (Cl. 2(a))<br><br>14th July 2009 | 6. Cancelling date (Cl. 2(a) and (c))<br><br>19th July 2009 |
|---|---|---|

| 7. Port or place of delivery (Cl.2 (a))<br><br>Offshore Work location Nam Rong Field, S.R. Vietnam being the point where an arriving vessel to the field would release the tow line and drop first anchor at a location to be confirmed 24 hours prior to arrival in Vietnamese water.<br>(The final specified location to be within the area between the Project site and Port of Vungtau) | 8. Port or place of redelivery/notice of redelivery (Cl. 2(d))<br><br>(i)Port or place of redelivery<br><br>Offshore Work location Nam Rong Field, S.R. Vietnam.<br><br>(ii)Number of days' notice of redelivery<br><br>Ten (10) days or job completion |
|---|---|

| 9. Period of hire (Cl.1(a))<br><br>Firm Hire period of 20 days.<br><br>Following completion of the Nam Rong & Doi Moi Project, in the event the Charterers' are awarded further pipelay or subsea construction contracts in Vietnamese waters, which scope of work is within the Vessel's capabilities, the Parties hereby agree that the period of hire shall be extended for such period required to complete the additional scope of work subject to receipt of advance notice in Box 10 (ii) as set out herein. | 10. Extension of period of hire (optional) (Cl. 1(b))<br><br>(i)Period of extension<br><br>Five (5) days + five (5) days + five (5) days in Charterer's option.<br><br>(ii) Advance notice for declaration of option (days)<br><br>Five (5) days |
|---|---|

| 11. Automatic extension period to complete voyage or well (Cl.1(c)) | 12. Mobilisation charge (lump sum and when due) (Cl. 2(b)(i)) |
|---|---|
| (i)Voyage or well (state which)<br><br>Construction of Offshore Pipeline "Nam Rong & Doi Moi Project | (i) Lump Sum<br><br>US$250,000 (US Dollars Two Hundred and Fifty Thousand). |
| (ii)Maximum extension period (state number of days)<br><br>Mutual agreement | (ii) When due<br><br>Upon delivery per Box 7 |
|  | 13. Port or place of mobilisation (Cl. 2(b)(i))<br><br>Brunei port or any port nearer to the vessel. |

| 14. Early termination of charter (state amount of hire payable) (Cl. 26(a))<br><br>Fifteen (15) days. | 15. Number of days' notice of early termination (Cl. 26(a))<br><br>Fifteen (15) days | 16. Demobilisation charge (lump sum) (Cl. 2(e) and Cl. 26(a))<br><br>US$200,000 (United States Dollars Two Hundred Thousand) |
|---|---|---|

| 17. Area of operation (Cl. 5(a))<br><br>South China Sea within S.R. Vietnam waters. | 18. Employment of vessel restricted to (state nature of service(s)) (Cl. 5(a))<br><br>Offshore construction and support, exclusive of Fire Fighting and Well Blow-Out support unless otherwise agreed. |
|---|---|

(continued)

(continued)        "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels        PART I

| 19. Charter hire (state rate and currency) (Cl. 10(a) and (d))<br><br>US$48,000/- per day. | 20. Extension hire (if agreed, state rate) (Cl. 10(b))<br><br>As per Box 19. |
|---|---|
| 21. Invoicing for hire and other payments (Cl. 10(d))<br><br>(i)state whether to be issued in advance or arrears<br><br>Invoices to be issued every 10 days, first invoice issued at Delivery per Box 7, payable within 14 days.<br><br>(ii)state to whom to be issued if addressee other than stated in Box 2<br><br>(iii)state to whom to be issued if addressee other than stated in Box 3. | 22. Payments (state mode and place of payment; also state beneficiary and bank account) (Cl. 10(e))<br><br>CITIBANK NA<br>Singapore Branch<br>Account No.: 0-823703-015<br>SWIFT Code: CITISGSG<br>Beneficiary name: Swiber Offshore Construction Pte Ltd |

| 23. Payment of hire, bunker invoices and disbursements for Charterers' account (state maximum number of days) (Cl.10(e))<br><br>Fourteen (14) days | 24. Interest rate payable (Cl. 10(e))<br><br>1% per month | 25. Maximum audit period (Cl. 10(f))<br><br>One (1) year |
|---|---|---|

| 26. Meals (state rate agreed) (Cl. 5(c)(i))<br>US$30.00 per man per day (refer Additional Clause No.2) | 27.Accommodation (state rate agreed) (Cl. 5(c)(i))<br>Not applicable | 28. Mutual Waiver of Recourse (optional, state whether applicable) (Cl. 12(f))<br><br>Applicable |
|---|---|---|

| 29. Sublet (state amount of daily increment to charter hire) (Cl. 17(b))<br><br>Not Applicable. | 30. War (state name of countries) (Cl. 19(e))<br><br>Vietnam |
|---|---|
| 31. General average (place of settlement – only to be filled in if other than London) (Cl. 21)<br><br>Singapore | 32. Breakdown (state period) (Cl. 28(b) (v))<br><br>48 hours per calendar month. |
| 33. Law and arbitration (state Cl. 31(a) or 31(b) or 31(c), as agreed; if Cl. 31(c) agreed also state place of arbitration) (Cl. 31)<br><br>Cl. 31(c) - Singapore Laws and Arbitration in Singapore. | 34. Numbers of additional clauses covering special provisions, if agreed<br><br>As per ANNEX B |
| 35. Names and addresses for notices and other communications required to be given by the Owners (Cl. 28)<br><br>Swiber Offshore Construction Pte Ltd.<br>12 International Business Park<br>Cyberhub@IBP #04-01, Singapore 609920<br>Tel. # +65-6505-0800<br>Fax # +65-6505-0801 | 36. Names and addresses for notices and other communications required to be given by the Charterers (Cl.28)<br><br>Likpin International Ltd,<br>Representative Office 13-02<br>13 Floor, City Tower 1, Sheikh Zayed Rd., Dubai, UAE<br>Tel. # +971-4-3328242<br>Fax # +971-4-3327494 |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter consisting of PART I, including additional clauses if any agreed and stated in Box 34, and PART II as well as ANNEX "A" (as annexed to this Charter. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "B" to the extent of such conflict but no further.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | 20-7-09 |

"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

### ADDITIONAL CLAUSES

**1. Pre-mobilisation Survey and On-hire Survey**

Prior to departure from the Mobilisation Port, but not later than 10th July 2009, Charterer's shall arrange and Owners shall permit a survey of the Vessel to be conducted to determine suitability of the Vessel and the Vessel's machinery, equipment & appurtenances for intended purpose. The survey shall be carried by an independent marine surveyor (Intention Braemar Falconer) who shall issue a survey report in their customary format.

Upon arrival at Port or Place of delivery as set out Box 7 herein, an on-hire survey shall be conducted by the Charterer's representative on board and an independent marine surveyor (Intention Braemar falconer Vietnam Company).

Mobilisation shall be deemed complete when the vessel is delivered to Port or Place of delivery as set out Box 7 herein. Charter Hire shall commence after drop of first anchor at Delivery Location. Delivery location shall be confirmed by Charterer 24hours prior to vessel arrival in Vietnamese water.

Demobilisation shall be deemed complete when all Charterer's Subcontractors and Third Party equipment has been demobbed from the vessel and vessel has picked up the last anchor for departure after outward clearance at site or in port.

The cost of the independent marine surveyor for on-hire survey shall be borne equally between the Owner and the Charterer.

Additional to the customary On-hire Survey pursuant Part II Clause 4 herein, the Owner shall furnish test and calibration records with respect to:

Crawler Cranes in service onboard

Davits to be used, or in service onboard

Anchor Winches

Additionally the Owner shall furnish a Suitability Study and Basis of Offshore Service De-Rating of the Crawler Crane.


**2. Daily Charter Hire Box 19**

Box 19 Daily Charter Hire is inclusive of:

Owners Crew as listed herein.

One (1) Anchor Handling Tug of not less than 4,000 bhp, to be nominated by the Owner, being suitable in all respects to support the Vessel in service under this Charter Party

Construction Barge (the Vessel) ready in all respects to commence sub-sea construction operations save equipment, personnel and materials identified as Charterers supply items herein.

Non-construction slings, shackles and rigging appliances operated from or used by Vessel crane

Suitable gangway

Suitable FRC (Fast Rescue Craft)

Suitable Pollution Response Kit

The Box 19 Daily Charter Hire is exclusive of:

Fuel and lubricants for all vessels nominated in Box 4, as more specifically defined in Part II Clause 8 (a).

All taxes of any kind if levied in or by S.R. of Vietnam in connection with the Charter.

Owner's preference is for Charterer to provide all catering services for all crew onboard the vessel spreads working in Vietnam. Should Charterer requires Owner to provide catering services to Charterer and Client personnel and their sub-contractors which shall be provided by the Owner, on the basis of USD$30/man/day, for such persons onboard.
Confirmation of Catering Services is required at departure of vessel from Port of Mobilisation in Brunei.

All other services provided by Owner to Charterer not detailed in this Charter Party shall be at cost +10%.


**3. Charterers Supply**

The Charter shall provide and pay for:

Customs and immigration clearance es may be required to permit the Vessel and anchor handling tug to commence sub-sea construction and/or work in Vietnamese waters shall be the Charterers responsibility and at the Charterers expense. In connection with the provision of such services, the Charterer shall notify the Owner of the documentary requirements required to complete such services in advance of Vessel and the anchor handling tug's entry into Vietnamese waters and the Owner shall furnish to the Charter such documentation in a timely manner so as to permit the Charterers to carry out these services without delay.



Pilot, berthing, port charges, berthing stevedoring, and provide ships agent services as more specifically defined in Part II, Clauses (a),(b) and (c), levied against Owner vessel in connection with the Charter.

Crew change transportation services by helicopter and /or supply boat from the offshore location, to the Port of Vung Tau, and onward land/river transportation to the nearest international airport, being Ho Chi Minh City, (and visa versa) and related documentary clearances. These services shall be provided on an equivalent status basis as Charterers own personnel. Owner shall use his best efforts to minimize the crew changes, and co-operate where possible with scheduled service arrangements.
For clarity, all necessary permits, visas and associated costs for Owner's crew to work in Vietnam shall be Charterer's responsibility.

It is agreed for up to thirty five (35) days following delivery of the Vessel there will be no requirement for crew change for Owner's supplied personnel however following the expiration of the first thirty five (35) days following delivery of the Vessel, the provisions of Clause 6 (Optional Services) shall apply.

For clarity, construction personnel provided by the Owner at the request of Charterer shall be charged to Charterer at the agreed day-rate and for any mob/demob, crew change and associated costs and items that does not have pre-agreed rates shall be charged at Cost +10%.

All load-out, transportation, logistics related to the re-supply and waste disposal from the Port of Vung Tau to the offshore location (and visa versa), so long as the Owner shall supply all chiller-freezer-food containers, all liquid and solid waste bins, skips and tanks.
(The provision for Owner supplied containers, waste bins, skips and tanks is subject to Owner providing catering services).

Emergency Medical Evacuation of Owners crew, to the admitting onshore hospital within S.R Vietnam.

All things related or to be incorporated in the Work, including but not limited to installation engineering, procedures, personnel qualification, materials, consumables, industrial gases etc.

Satellite communication (provided by Owner) charges, other than for ship business (at cost + 10%).

PPE other than issued to Owners Crew.

Weather forecasting services.

Project insurance and related deductibles. Charterers shall include Owners and its Subcontractors as additional assureds under the project insurance policy with an endorsement for waiver of subrogation rights.

Owner Medic shall provide first aid and initial emergency medical treatment, for all personnel on board the Vessel(s). Charterer shall provide Vietnamese male nurse to assist Owners Medic in dealing with Charterers Vietnamese speaking crew.

4. **Owners Crew and Optional Services**

The Owners Time Charter crew, in accordance with the intent of the original tender documents related to this Charter:

| Position | Quantity |
|---|---|
| Superintendent | 1 |
| HSE Officer | 1 |
| Administrators | 2 |
| Doctor | 1 |
| Deck Foreman | 2 |
| Crane Operators | 2 |
| Tower Operators | 2 |
| All below Deck, Galley and Catering. | Not Quantified (as required to perform duties for normal and acceptable operations) |

**Optional Services.**

Additionally the Owner offers to provide as optional services, the following personnel, Subcontractors services and equipment. These optional services shall be provided as a separate services to this charter arrangement as they are third party services and not part of Owner's personnel or equipment. Charterer can elect to obtain these services directly and requested prior to mobilisation with fourteen (14) days.

Optional Additional Crew

| Position | Quantity | Unit Rate US$ per day | Total US$ per day | Mob/Demob |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |



2.  Crew change for provided crew will occur in 60 days and will be payable by Charterer as actual cost to point of origin/destination +5%. Day Rate shall also be paid up to point of destination.

**5.  Payment Terms and Letter(s) of Credit –**

a.  One day prior to the estimated date of arrival of the Vessel at the Port or Place of Delivery as set out in Box 7 herein, the Charterer shall establish a Letter of Credit, in a form and from a bank acceptable to the Owner, issued by the Charterer's bank in favour of the Owner for an amount equivalent US \$450,000 (United States Dollars Four hundred and Fifty Thousand) being the lump sum Mobilisation Charge as set out in Box 12(i) herein;

b.  Charter Hire payments as set out in Box 19 herein shall be made by the Charterer to the Owner against the following documents:

    (i)  For Fixed Invoices:
       - Invoice.
       - Working statement summary duly signed by both parties.

    (ii)  For Variable Invoices
       - Invoice
       - Accommodation summary statement.
       - Other services charged with proper supporting duly signed

A Letter of Credit, in a form and from a bank acceptable to the Owner, shall be issued by the Charterer's bank in favour of the Owner for an amount equivalent to ten (10) days hire. The validity of the Letter of Credit shall be for thirty five (35) days from the Date of Delivery.

The Letter of Credit shall contain a provision whereby in the event that the Charterer fails to provide the evidence of payment of due hire from the date upon which the hire falls due, the Owner shall be entitled to draw against the Letter of Credit without notification to the Charterer, subject to presentation to the negotiating bank the original invoice and working statement summary duly signed by both parties, as set out in Clause 5b(i) herein, for the period for which due hire has not been paid.

In such event, the Charterer shall, within seven (7) days from the date upon which the Owners draw against the original Letter of Credit, established a new Letter of Credit in the same amount and on the same terms against which the Owner may draw at such future date in the event the Charterer fails to provide evidence of payments as aforesaid

Should the Charterer exercise optional period/s as provided for in Box 10 herein, the Charterer shall arrange for an extension of the Letter of Credit for a period commensurate with the period of extension.

**6.  Suspension of Hire**

For the purposes of this Clause it is explicitly agreed that the Charter Hire set out in Box 19 herein is for the Vessel and one (1) anchor handling tug.

Vessel:            US \$42,000 (United States Dollars One Hundred and Twenty One Thousand )/day
Anchor Handling Tug 1:  US \$6,000 (United States Dollars Seven Thousand)/day

For the purposes of Suspension of Hire as set out in Part II, Clause 11 of this Agreement, the Vessel and the anchor handling tug shall be considered as divisible and separate whereby suspension of hire shall apply only to that vessel or the anchor handling tug which fails to be fit and capable of providing the intended service under this Charter Party and the amount of suspended hire shall be calculated by reference to the assigned individual Charter hire set out herein.

Should Charterer elect to provide Anchor Handling Tug the above Anchor Handling Tug rate above will be deducted from the Day Rate in Box 19.

**7.  Law and Arbitration (Box 33 and Cl. 31 (c))**

For clarity of the Arbitration process, the following shall apply:

Arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC") for the time being in force.

The tribunal shall consist of three arbitrators. Each Party shall appoint one arbitrator, and the two arbitrators shall jointly appoint the third arbitrator. In the event that the arbitrators appointed by the parties cannot agree on the appointment of the third arbitrator, then the third arbitrator shall be appointed by the Chairman of the SIAC.

The language of the arbitration shall be English and the decision of the arbitrators shall be final and binding on the parties. The parties hereby expressly waive any rights of appeal that they might have under any applicable law against the decision of the arbitrators.

**8.  Liabilities and Indemnities**

The Owner shall not be responsible for loss or damage to third party property and personnel and/or loss or damage to the projects and related works of such projects contemplated in this Charter Party even if such loss or damage is caused wholly or partially by the act, neglect or default of the Owners, its affiliates, subsidiaries, their employees, contractors or subcontractors. The Charterer shall hereby indemnify, defend and hold harmless Owners, its parent, affiliates and subsidiaries from any and all claims, costs, expenses, actions, proceedings, suits, demands and liabilities whatsoever arising out of or in connection with such loss or damage.

9. **Effective Date of Contract**

The Charterer shall carry out a pre-mobilisation survey of the Vessel as set out in Additional Clause 1 herein within the time stipulated therein.

Upon the Charterer completing the pre-mobilisation survey as aforementioned, not later than 24 hours thereafter, the Charterer shall notify the Owner of their acceptance or rejection of the Vessel.

In the event the Charterer notifies the Owner of it's acceptance of the Vessel, this Contract shall become effective as of the date (the "Effective Date") of the issue of such notice by the Charterer.

If the Charter rejects the vessel or fails to give such notices as set out above within 24 hours after completion of the pre-mobilisation survey this Contract shall be deemed null and void and of no further effect and neither party shall have any claim against the other arising there from of otherwise relating thereto.



ANNEX "A" to Uniform
Time Charter Party for Offshore Service Vessels
Code Name "SUPPLYTIME 89" – dated 01ˢᵗ MARCH 2009



**VESSEL SPECIFICATION**



ANNEX "B"
to Uniform Time Charter Party for Offshore Service Vessels
Code Name "SUPPLYTIME 89" – dated 01st MARCH 2009



### INSURANCE

Insurance policies (as applicable) to be procured and maintained by the Owners under Clause 14:

(1)  *Marine Hull Insurance.* - Hull and Machinery Insurance shall be provided with limits equal to those normally carried by the Owners for the Vessel.

(2)  *Protection and Indemnity (Marine Liability) Insurance.* – Protection and Indemnity or Marine Liability Insurance shall be provided for the Vessel with a limit equal to the value under paragraph 1 above or U.S. $5 million, whichever is greater, and shall include but not be limited to coverage forcrew liability, third party bodily injury and property damage liability, including collision liability, towers liability (unless carried elsewhere).

(3)  *General Third Party Liability Insurance.* – Coverage shall be for:
Bodily Injury                          per person
Property Damage                  per occurrence.

(4)  *Workmen's Compensation and Employer's Liability Insurance for Employees.* – Covering non-employees for statutory benefits as set out and required by local law in area of operation or area in which the Owners may become legally obliged to pay benefits.

(5)  *Comprehensive General Automobile Liability Insurance.* –
Covering all owned, hired and non-owned vehicles,
Coverage shall be for;
Bodily Injury According to the local law.
Property Damage          In an amount equivalent to single limit per occurrence.

(6)  Such other insurances as may be agreed.





ANNEX "C" to Uniform Time Charter Party for Offshore Service Vessels
Code Name "SUPPLYTIME 89" – dated 01st MARCH 2009

## AGREEMENT FOR MUTUAL INDEMNITY AND WAIVER OF RECOURSE
### (Optional, only applicable if stated in Box 26 in PART I)

This Agreement is made between the Owners and the Charterers and is premised on the following:

(a) The Charterers and the Owners have entered into a contract or agreement dated as above regarding the performance of work or service in connection with the Charterers' operations offshore ("Operations");

(b) The Charterers and the Owners have entered into, or shall enter into, contracts or agreements with other contractors for the performance of work or service in connection with the Operations;

(c) Certain of such other contractors have signed, or may sign, counterparts of this Agreement or substantially similar agreements relating to the operations ("Signatory" or collectively "signatories"); and

(d) The Signatories wish to modify their relationship at common law and avoid entirely disputes as to their liabilities for damage or injuries to their respective property or employees;

In consideration of the premises and of execution of reciprocal covenants by the other Signatories, the Owners agree that:

1. The Owners shall hold harmless, defend, indemnify and waive all rights of recourse against the other Signatories and the irrespective subsidiary and affiliate companies, employees, directors, officers, servants, agents, invitees, vessel(s) and insurers, from and against any and all claims, demands, liabilities or causes of action of every kind and character, in favour of any person or party, for injury to, illness or death of any employee of or for damage to or loss of property owned by the Owners (or in possession of the Owners by virtue of an arrangement made with an entity which is not a Signatory) which injury, illness, death, damage or loss arises out of the Operations, and regardless of the cause of such injury, illness, death, damage or loss even though caused in whole or in part by a pre-existing defect, the negligence, strict liability or other legal fault of other Signatories.

2. The Owners (including the Vessel) shall have no liability whatsoever for injury, illness or death of any employee of another Signatory under the Owners' direction by virtue of an arrangement made with such other Signatory, or for damage to or loss of property of another Signatory in the Owners' possession by virtue of an arrangement made with such other Signatory. In no event shall the Owners (including the Vessel) be liable to another Signatory for any consequential damages whatsoever arising out of or in connection with the performance or non-performance of this Agreement, including, but not limited to, loss of use, loss of profits, shut-in or loss of production and cost of insurance.

3. The Owners undertake to obtain from their insurers a waiver of rights of subrogation against all other Signatories in accordance with the provisions of this Agreement governing the mutual liability of the Signatories with regard to the Operations.

4. The Owners shall attempt to have those of their subcontractors which are involved in the Operations become Signatories and shall promptly furnish the Charterers with an original counterpart of this Agreement or of a substantially similar agreement executed by its subcontractors.

5. Nothing contained in this Agreement shall be construed or held to deprive the Owners or the Charterers or any other Signatory as against any person or party, including as against each other, of any right to claim limitation of liability provided by any applicable law, statute or convention, save that nothing in this Agreement shall create any right to limit liability. Where the Owners or the Charterers or any other Signatory may seek an indemnity under the provisions of this Agreement as against each other in respect of a claim brought by a third party, the Owners or the Charterers or any other Signatory shall seek to limit their liability against such third party.

6. The Charterers shall provide the Owners with a copy of every counterpart of this Agreement or substantially similar agreement which is executed by another Signatory pertaining to the Operations, and shall, in signing this, and in every counterpart of this Agreement, be deemed to be acting as agent or trustee for the benefit of all Signatories.

7. This Agreement shall inure to the benefit of and become binding on the Owners as to any other Signatories on the later of the date of execution by the Owners and the date of execution of a counterpart of this Agreement or a substantially similar agreement by such other Signatory pertaining to the Operations.

8. Any contractor, consultant, sub-contractor, etc., performing work or service for the Charterers or another Signatory in connection with the Operations which has not entered into a formal contract for the performance of such work or service may nevertheless become a Signatory by signing a counterpart of this Agreement or a substantially similar agreement which shall govern, as to the subject of this Agreement, the relationship between such new Signatory and the other Signatories and also by extension its relations with the Charterers.

9. This Agreement may be executed in any number of counterparts or substantially similar agreements as necessary but all such counterparts shall together constitute one legal instrument.



ANNEX "D" to Uniform Time Charter Party for Offshore Service Vessels
Code Name "SUPPLYTIME 89" – dated 01ˢᵗ MARCH 2009





"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels    **PART II**



**1. Period**

**2. Delivery and Redelivery**

**3. Condition of Vessel**

**4. Survey**

**5. Employment and Area of Operation**

**6. Master and Crew**

**7. Owners to Provide**

**8. Charterers to Provide**



"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels                              **PART II**

## 8. Bunkers

## 10. Hire and Payments

## 11. Suspension of Hire

## 12. Liabilities and Indemnities

"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels    PART II

13. Pollution

14. Insurance

15. Saving of Life and Salvage

16. Lien

The Owners shall have a lien upon all cargoes and all sub-freights payable to the Charterers and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned. The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel. Except as provided in Clause 12, the Charterers shall indemnify and hold the Owners harmless against any lien of whatsoever nature arising upon the Vessel during the Charter Period while she is under the control of the Charterers, and against any claims against the Owners arising out of the operation of the Vessel by the Charterers or out of any neglect of the Charterers in relation to the Vessel or the operation thereof. Should the Vessel be arrested by reason of claims or liens arising out of her operation hereunder unless brought about by the act or neglect of the Owners, the Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their own expense put up bail to secure release of the Vessel.

17. Sublet and Assignment

18. Substitute Vessel

19. War

20. Excluded Ports

Notwithstanding the terms of Clause 11 Hire shall be paid for all time lost including any lost owing to loss of or sickness or injury to the Master, Officers, Crew or passengers or to the action of the Crew in refusing to proceed to such place or to be exposed to such risk.   612/614/616

**21. General Average and New Jason Clause**

General Average shall be adjusted and settled in London unless otherwise stated in Box 31, according to York/Antwerp Rules, 1974, as may be amended. Hire shall not contribute to General Average. Should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply:

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, loss or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo.
If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the Owners before delivery."

**22. Both-to-Blame Collision Clause**

If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owners in the navigation or in the management of the Vessel, the Charterers will indemnify the Owners against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents loss of or damage to, or any claim whatsoever of the owners of any goods carried under this Charter Party paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set off recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than or in addition to the colliding ships or objects are at fault in respect of a collision or contact.

**23. Structural Alterations and Additional Equipment**

The Charterers shall have the option of at their expense, making structural alterations to the Vessel or installing additional equipment with the written consent of the Owners which shall not be unreasonably withheld but unless otherwise agreed the Vessel is to be restored and reinstated, at the Charterers expense, to her original condition. The Vessel is to remain on hire during any period of those alterations or reinstatement. The Charterers, unless otherwise agreed, shall be responsible for repair and maintenance of any such alteration or additional equipment.

**24. Health and Safety**

The Owners shall comply with and adhere to all applicable international, national and local regulations pertaining to health and safety, and such Charterers, instructions as may be appended hereto.

**25. Taxes**

Each party shall pay taxes due on its own profit, income and personal. The Charterers shall pay all other taxes and dues arising out of the operation or use of the Vessel during the Charter Period.
In the event of change to the Area of Operation or change in local regulation and/or interpretation thereof, resulting in an alteration and incremented change of the Owners, tax liability after the date of entering into this Charter Party or the date of commencement of employment, whichever is the earlier Hire shall be adjusted accordingly.

**26. Early Termination**

**(a) For Charterers' Convenience** - The Charterers may terminate this Charter Party at any time by giving the Owners written notice as stated in Box 18 and by paying the settlement stated in Box 34 and the demobilisation charge stated in Box 10, as well as Hire or other payments due under the Charter Party.

**(b) For Cause** - If either party becomes informed of the occurrence of any event described in this Clause that party shall so notify the other party promptly in writing and in any case within 5 days after such information is received. If the occurrence has not ceased within 3 days after such notification has been given, this Charter Party may be terminated by either party without prejudice to any other rights which either party may have, under any of the following circumstances:

(i) **Requisition** - If the government of the state of registry and/or the flag of the Vessel, or any agency thereof requisitions the hire or title or otherwise takes possession of the Vessel during the Charter Period.

(ii) **Confiscation** - If any government, individual or group, whether or not purporting to act as a government arrests hold of any government, confiscates, requisitions, expropriates, seizes or otherwise takes possession of the Vessel during the Charter Period.

(iii) **Requisition** - In the event of an order being made or resolution passed for the winding up, dissolution, liquidation or other analogy or similar matter of a receiver is appointed or if a separate payment or ceases to carry on business.

(iv) **Loss of Vessel** - If the Vessel is lost, actually or constructively or missing, unless the Owners provide a substitute vessel pursuant to Clause 18. In the case of termination, Hire shall cease from the date the Vessel was lost or in the event of a constructive total loss, from the date of the event giving rise to such loss if the date of loss cannot be ascertained or the Vessel is missing, payment of Hire shall cease from the date the Vessel was last reported.

(v) **Breakdown** - If, at any time during the term of this Charter Party, a

breakdown of the Crews, equipment or Vessel results in the Owners' being unable to perform their obligations hereunder for a period exceeding that stated in Box 32, unless the Owners provide a substitute vessel pursuant to Clause 18.

**(vi) Force Majeure** - If a force majeure condition as defined in Clause 27 prevails for a period exceeding 10 consecutive days.

**(vii) Default** - If either party is in repudiatory breach of the obligations thereunder.

Termination as a result of any of the above mentioned causes shall not relieve the Charterers of any obligation for Hire and other payments due.

**27. Force Majeure**

Neither the Owners nor the Charterers shall be liable for any loss, damages or delay or failure in performance hereunder resulting from any force majeure event, including but not limited to acts of God, fire, action of the elements, epidemics, war (declared or undeclared), warlike actions, insurrection, revolution or civil strife, piracy, civil war or hostile action, strikes or differences with workmen (except for disputes relating solely to the Owners, or the Charterers, employees), acts of the public enemy, federal or state laws, rules and regulations of any governmental authorities having or asserting jurisdiction in the premises or of any other group, organisation or informal association (whether or not formally recognised as a government), and any other cause beyond the reasonable control of either party which makes continuance of operations impossible.

**28. Notices and Invoices**

Notices and invoices required to be given under this Charter Party shall be given in writing to the addresses stated in Boxes 21, 36 and 36 as appropriate.

**29. Wreck Removal**

If the Vessel sinks and becomes a wreck and an obstruction to navigation and has to be removed upon request by any compulsory law or authority having jurisdiction over the area where the wreck is placed, the Owners shall be liable for any and all expenses in connection with the raising, removal, destruction, lighting or marking of the wreck.

**30. Confidentiality**

All information or data obtained by the Owners in the performance of this Charter Party is the property of the Charterers, is confidential and shall not be disclosed without the prior written consent of the Charterers. The Owners shall use their best efforts to ensure that the Owners, any of their sub-contractors, and employees and agents thereof shall not disclose any such information or data.

**31. Law and Arbitration**

*(i) (a) This Charter Party shall be governed by English law and any dispute arising out of this Charter Party shall be referred to arbitration in London, one arbitrator being appointed by each party, in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. On the receipt by one party of the nomination in writing of the other party's arbitrator that party shall appoint their arbitrator within 14 days, failing which the arbitrator first appointed shall act as sole arbitrator. If two arbitrators properly appointed shall not agree they shall appoint an umpire whose decision shall be final. (b) If this Charter Party provides for arbitration in three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, this agreement may be made a rule of the Court. The arbitrators shall be members of the Society of Maritime Arbitrators, Inc. of New York and the proceedings shall be conducted in accordance with the rules of the Society.*

*(c) Any dispute arising out of this Charter Party shall be referred to arbitration at the place stated in Box 33 subject to the law and procedures applicable there.*

*(d) If Box 33 in PART I is not filled in sub-clause (a) of this Clause shall apply.*

*(ii), (iii) and (c) are alternatives; state alternative agreed in Box 33*

**32. Entire Agreement**

This is the entire agreement of the parties, which supersedes all previous written or oral understandings and which may not be modified except by a written amendment signed by both parties.

**33. Severability Clause**

If any portion of this Charter Party is held to be invalid or unenforceable for any reason by a court or governmental authority of competent jurisdiction, then such portion will be deemed to be voidable and the remainder of this Charter Party shall continue in full force and effect.

**34. Demise**

Nothing herein contained shall be construed as creating a demise of the Vessel to the Charterers.

**35. Definitions**

"Well" is defined for the purposes of this Charter Party as the term required to drill, test, complete and/or abandon a single borehole including any side-track thereof.

"Offshore unit" is defined for the purposes of this Charter Party as any vessel, offshore installation, structure and/or mobile unit used in offshore exploration, construction, pipelaying or repair, exploitation or production.

"Offshore site" is defined for the purposes of this Charter Party as the area within three nautical miles of an "offshore unit" from or to which the Owners are requested to take their Vessel by the Charterers.

"Employees" is defined for the purposes of this Charter Party as employees, directors, officers, servants, agents or invitees.

**36. Headings**

The headings of this Charter Party are for identification only and shall not be deemed to be part hereof or be taken into consideration in the interpretation or construction of this Charter Party.





| **Swiber** | **NAM RONG DOI MOI PROJECT** | | | |
|---|---|---|---|---|
| | **Swiber Glorious - Charter** | | | |
| | **PROJECT NO.** | **AMENDMENT** | **DATE** | **PAGE** |
| | C8600 | 1 | 14/07/09 | Page 1 of 2 |

## AMENDMENT / MODIFICATION

### AMENDMENT No. 1

Pursuant to the Charter Party Agreement for the hire of the 'Swiber Glorious' dated 07 July 2009, each of Likpin International Ltd (Likpin) and Swiber Offshore Construction Pte Ltd (SOC) confirm and agree that the Charter Party is hereby amended as follows, with such amendment taking effect as of the Effective Date listed below:

| Description of the Amendment/Modification | *Dayrate Provision for Additional Construction Crew onboard the Swiber Glorious.* |
|---|---|

Charterer have requested for the following construction crew to be provided by Owner to Charterer as follows:

- Barge Leader man (Expat):  (2 off)  USD $750 per man per day
- Rigger Foreman:  (2 off)  USD $204 per man per day
- Rigger Leader man:  (2 off)  USD $132 per man per day
- Riggers:  (6 off)  USD $75 per man per day
- Scaffolders:  (2 off)  USD $75 per man per day
- Radio Operators:  (2 off)  USD $140 per man per day

Construction Crew charges shall be from point of origin until return to point of origin.

Payment Terms:
Payment for Construction Crew provided to Charterer shall be invoiced in advance for 14 days period commencing from mobilisation of crew and payment shall be made within 7 days upon receipt of invoice.

| **Effective Date** | 14 July 2009 |
|---|---|

Likpin and SOC acknowledge and agree that except as modified herein, the terms of the Charter Party (including any prior amendments or modifications) remain the same and the parties continue to be bound fully by the Charter Party as so modified.

**SIGNED for and on behalf of Likpin International Ltd:**

SIGNATURE:    ......................................

Name (in capitals):  ALAN ROBERTS

Position (in capitals): PROJECT MANAGER

Date:    ......17/7/09..........

*Swiber Glorious - Amendment No 1 Rev 1.doc*

| **Swiber** | **NAM RONG DOI MOI PROJECT** | | |
|---|---|---|---|
| | **Swiber Glorious - Charter** | | |
| | PROJECT NO. | AMENDMENT | DATE | PAGE |
| | C8600 | 1 | 14/07/09 | Page 2 of 2 |

SIGNED for and on behalf of Swiber Offshore Construction Pte Ltd:

SIGNATURE: .....................................

Name (in capitals):    NITISH GUPTA

Position (in capitals): CEO

Date:    .....14 / 07 / 09.....



| | NAM RONG DOI MOI PROJECT | | | |
|---|---|---|---|---|
| **Swiber** | Swiber Concorde - Charter | | | |
| | PROJECT NO. | AMENDMENT | DATE | PAGE |
| | C8600 | 2 | 12/08/09 | Page 1 of 1 |

### AMMENDMENT NO. 2

Pursuant to the Charter party Agreement for the hire of the " Swiber Glorious" dated 09 July 2009, each of Likpin Internatuonal Ltd ( Likpin) and Swiber Offshore Construction Pte Ltd (SOC) confirm and agree that the Charter Party is hereby amended as follows, with such amendment taking effect as the Effective Date Listed below:

| | |
|---|---|
| **Description of the Amendment/Modification** | Change of Adress as per Clause 28, Notices and Invoices *(Notices and Invoices required to be given under this Choryter Party shall be given in writing to the addresses stated in Box 21, 35 and 36 as appropriate)* in compliance to the LC Requirement. |
| **OLD ADDRESS:** | LIKPIN INTERNATONAL LTD<br>Representative office 13-02<br>13 Floor City Tower 1, Sheikk Zayed Rd., Dubai<br>United Arab Emirates |
| **NEW REVISED ADDRESS:** | ATLAS MARITIME LLC<br>PO BOX 32737, Dubai<br>United Arab Emirates |

LIKPIN and SOC acknowledge and agree that except as modified herein, the terms of the Charter Party  (including any prior amendm:nts or modifications) remain the same and the parties continue to be bound fully by the Charter Party as so modified.

SIGNED F for and on behalf of Likpin International Ltd:

SIGNATURE:          ...................................

Name ( in capitals): M. SHOURIDEH

Position (in capitals):     PROJECT MANAGER

Date:          ...................................

SIGNED  for and on behalf of Swiber Offshore Construction Pte Ltd:

SIGNATURE:          ...................................

Name ( In capitals): NITISH GUPTA

Position (in capitals):     CEO

Date:          ...................................

*M.S, as discussed this ammndment is required by Swiber bank ad accouts system to procesr the LC claim for CPA*

*TK-Sahi*

*12/8/09.*

**Amendment No. 01 to Charter Party agreements dated the 29th May 2009 and 7th July 2009**

SWIBER OFFSHORE CONSTRUCTION Pte Ltd (the "Owner") and LIKPIN INTERNATIONAL LTD entered into to Charter Party Agreements dated 29 May 2009 and 7 July 2009 respectively ("Charter Party Agreements") to charter Swiber Concord and Swiber Glorious.

The parties on this day the 21st August 2009 have agreed to amend the Charter Party Agreements as follows:

It is hereby mutually agreed between the parties ("The Owner") SWIBER OFFSHORE CONSTRUCTION Pte Ltd and the sole charterer LIKPIN INTERNATIONAL LTD that the charterer shall be PETECHIM JSC and LIKPIN INTERNATIONAL LTD a Consortium (having its place of business at 7th Floor Citylight Tower, 45 Vo Thi Sau Street District 1,Ho Chi Minh City, Vietnam. Tel:+84 839106952, Fax: +84 839106938) and that PETECHIM JSC and LIKPIN INTERNATIONAL LTD hereinafter ("The Charterer") shall be jointly and severally liable for the due and proper performance of all of the charterers obligations set out in the Charter Party Agreement from 21st August 2009, without limitation but excluding works performed and invoiced to LIKPIN INTERNATIONAL LTD, prior to the 21st of August 2009, which Petechim JSC shall not be responsible for.

It is further agreed between the parties with respect to Fixed and Variable Invoices issued by "The Owner" and notwithstanding "The Charterer" rights under this Charter Party Agreement that from the date of signing this amendment all and any invoices irrespective of whether such invoices are agreed, in dispute or have fallen due will in part become due a further 28 days from the previous due date or earlier where possible.

Furthermore it was agreed that "The Charterer" is relieved from issuing any forms of securities or Letters of Credit and that all and any invoices will be subject to joint verification by PETECHIM JSC and LIKPIN INTERNATIONAL LTD and that all payments will be made in cash by telegraphic transfer through LIKPIN INTERNATIONAL LTD, however in the case any payments are made via PETECHIM JSC on behalf of the Consortium, then it is further agreed that "The Charterer" will deduct from any invoice to a maximum of 5.28% a tax deduction under the provisions of Vietnamese Law for CIT Taxes and provide such receipts as issued by the receiving tax department.

| Signature (Owners) | Signature (Charterer) | Signature (Charterer) |
|---|---|---|
| SWIBER-OFFSHORE CONSTRUCTION Pte Ltd | LIKPIN INTERNATIONAL LTD | PETECHIM JSC |
| Name: DARREN YOU | Name: Shourdy | Name: HOANG DUONG |
| Position: G-D | Position: M-D | Position: CHAIRMAN |